[L.A. No. 31572. Feb. 7, 1983.]

MARIO P. GONZALEZ, a Judge of the Municipal Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

360

**COUNSEL**

Albert C. S. Ramsey and Edward P. George, Jr., for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz, Susan D. Martynec and Donald E. De Nicola, Deputy Attorneys General, for Respondent.

OPINION

**THE COURT.**\*—Petitioner was appointed municipal court judge in May 1972. In June 1980 the Commission on Judicial Performance (Commission) notified petitioner, pursuant to rule 904 of the California Rules of Court, of certain allegations of judicial misconduct.[1] In November 1980 the Commission served petitioner with a notice of formal proceedings, as required by rule 905, consisting of seven counts and fifty-five subcounts of "wilful misconduct in office" and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (hereinafter "wilful misconduct" and "conduct prejudicial," respectively).

We appointed three special masters to take testimony on this matter, and the Commission appointed examiners to present the case. After 17 days of confidential hearings the masters issued their report to the Commission in November 1981, concluding that petitioner had not engaged in wilful misconduct or conduct prejudicial. The Commission heard oral argument, and in May 1982 issued its findings of fact and conclusions of law, sustaining 21 counts of wilful misconduct and conduct prejudicial. The Commission recommended that petitioner be removed from office.

Judge Gonzalez disputes the Commission's findings and recommendation, and petitions this court for review. Beyond challenging the merits of the Commission's conclusions, he raises a procedural objection that we dispose of at the outset. He claims that by granting the examiners an additional 10-day extension to file their objections to the report of the masters, beyond the 30-day extension initially granted, the Commission violated rule 915, which limits time extensions to 30 days "in the aggregate." In addition, he contests the Commission's acceptance of the objections, filed two days after the expiration of the second extension.

Although he does not request any specific form of relief, presumably petitioner contends this proceeding should have been terminated upon the examiner's failure to meet the filing deadlines. His claim is without merit. Not only was Judge Gonzalez not prejudiced by the 12-day delay (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 519 [116 Cal.Rptr. 260, 526 P.2d 268]), but in fact he benefitted from the Commission's liberality by requesting and receiving "identical time" to file his own objections. Furthermore, as a matter of policy, it would be unwise to forsake inquiry into the substance of serious allegations of judicial misconduct merely because of such a brief procedural delay.

---

\*Before Bird, C. J., Mosk, J., Richardson, J., Kaus, J., Reynoso, J., Grodin, J., and McClosky, J.†

[1] Unless otherwise specified, all further rule references are to the California Rules of Court.

---

†Assigned by the Chairperson of the Judicial Council.

■ We turn now to the merits of Judge Gonzalez' case and begin by summarizing the duties and standards governing our review. Initially it is our duty independently to review the evidence adduced by the masters. The standard of proof we must apply is well established: the allegations must be proved by "clear and convincing evidence sufficient to sustain a charge to a reasonable certainty." (*Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].) ■ We have also defined standards of judicial performance to guide our review of the Commission's disciplinary recommendation: "The ultimate standard for judicial conduct must be conduct which constantly reaffirms fitness for the high responsibilities of judicial office." (*Id.* at p. 281.)

■ The charge of wilful misconduct connotes "unjudicial conduct which a judge acting in his judicial capacity commits in bad faith, . . ." (*Id.* at p. 284.) "Bad faith" is equivalent to actual malice and encompasses the intentional commission of acts which the judge knew or reasonably should have known were beyond his lawful power, as well as acts which though within the ambit of lawful judicial authority are committed for purposes other than the faithful discharge of judicial duties. (*Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 796 [119 Cal.Rptr. 841, 523 P.2d 1209].)

■ The lesser included charge of conduct prejudicial connotes "conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office," as well as wilful misconduct out of office, "i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity." (*Geiler, supra,* 10 Cal.3d at p. 284 & fn. 11.) ■ A judge may be censured or removed from the bench only for wilful misconduct or conduct prejudicial.

In keeping with our obligation to scrutinize the record, we have examined in detail the full transcript of the hearings before the masters, the examiners' objection to the report of the masters, the report of the masters, the Commission's findings of fact and conclusions of law, as well as the briefs filed in this court. We concur in 20 of the Commission's 21 charges of wilful misconduct and/or conduct prejudicial, adopt its findings of fact on these counts as our own, and set out pertinent portions of its findings in the margin.[2] We summarize the fac-

---

[2]The Commission's findings, in pertinent part, are as follows:

"FINDINGS OF FACT

"*I. (Count III, Paragraphs 3c and 3a)*

"Respondent has used his judicial office improperly in influencing, or attempting to influence, law enforcement officers and officers of the court concerning criminal matters.

"1. In March, 1978, Respondent summoned Deputy District Attorney Joseph R. Martinez to his chambers to attempt to influence him to dismiss a case not then pending before Respondent, the case of *People* v. *Frank Jose Terrones* (M191676), in which defendant had already pleaded

tual determinations and legal conclusions reached.

## 1.

■ First, we find clear and convincing evidence that Judge Gonzalez has

guilty and had been sentenced. Present in Respondent's chambers was Los Angeles County Deputy Sheriff Art Guerra, who regularly sought and received from Respondent dismissals of traffic cases on behalf of defendants, and who previously had requested such a dismissal from Mr. Martinez and had been refused.

"2. In May, 1978, Deputy District Attorney Joseph R. Martinez was contacted regarding a felony case, *People* v. *Kasparian* (A343101), by three people: the defendant's father; Mr. Semon Kasperoff, a wealthy, influential member of the community and long-time friend of Respondent's; and another person; concerning an immediate disposition of the case. Mr. Martinez told them that it was a good case which would proceed to preliminary hearing, and suggested that they seek the assistance of an attorney. Later that same day, Respondent telephoned Mr. Martinez about the *Kasparian* case, which was not then pending before Respondent, and asked if Mr. Martinez would discuss the matter in his chambers with the above-named persons. It was Mr. Martinez' belief, based on his prior experiences with Respondent, that Respondent wanted him present in his chambers to attempt to pressure him into a disposition of the case.

" . . . . . . . . . . . . . . . . . . . . .

"*II. (Count I, Paragraphs 1, 2, 3 and 5)*

"Respondent has acted improperly, unreasonably, and arbitrarily in matters of bail-setting and own-recognizance release.

"1. Respondent admitted that in three cases during his tenure on the bench, after he had denied motions to release on own recognizance, he had offered to grant such releases if defense counsel would issue personal checks for $25 to their favorite charity, which Respondent would hold and return to them after the cases had been terminated. Respondent advised defense counsel that if they had that much trust and confidence in their clients, they could prove that good-faith belief in their clients' integrity by advancing their own personal checks.

" . . . . . . . . . . . . . . . . . . . . .

"2. On or about December 17, 1975, in *People* v. *Larry Williams* (M175329), Deputy Public Defender Bruce Hoffman appeared before Respondent to request an own recognizance release for defendant Williams. Hoffman was appearing for the attorney of record, private counsel Stan Delnick. Respondent, without allowing argument on the merits, stated that defendant's motion would be denied unless Mr. Hoffman was requesting defendant's own recognizance release as a special favor, in which event the motion would be granted.

"3. On or about December 17, 1975, in the case of *People* v. *Larry Williams* (M175329), · Stan Delnick, a private attorney appointed to represent defendant Williams, requested that Respondent release defendant on his own recognizance. Respondent refused to order an own-recognizance release for defendant Williams, who was then free on his own recognizance in two other pending cases, but agreed to release defendant upon Mr. Delnick personally posting $50 cash bail, in violation of Rule 5-104(A) of the Code of Professional Conduct, which was done.

"4. On or about February 3, 1975, in the case of *People* v. *Manuel Cruz Cerda* (M167759), defendant appeared before Respondent for arraignment. The charge was violation of Penal Code Section 148. Deputy District Attorney Richard Neidorf and the filing deputy for the District Attorney's office, Jess Cortez, both moved for dismissal of the case.

"Respondent then read the police report and inquired of the defendant as to certain factual matters, such as what defendant Cerda had allegedly done to violate the law. Deputy Public Defender Bruce Hoffman objected to the questioning. Thereupon, Respondent denied the motion to dismiss, set a pre-trial date for February 7, 1975, and set bail at $500.

"Mr. Hoffman moved for defendant's release on his own recognizance. Respondent refused to entertain the motion, indicating that he had lost jurisdiction in the case once it had been set for pre-trial. Respondent indicated that he would not entertain the motion because Mr. Hoffman had been the one who had opened his mouth when Respondent had attempted to question the defendant.

"*III. (Count VII, Paragraph 4)*

"Respondent repeatedly has made insulting comments from the bench about the judges with

used his judicial office improperly by attempting to intercede in criminal mat-

whom he shared the East Los Angeles bench. It is true that on occasions Respondent did critically remark as to the work habits of his judicial colleagues and did recklessly threaten and impugn the integrity of his colleagues.

"IV. (Count III, Paragraphs 1a, 1b, 1b' and 2c)

"Respondent has overreached his judicial authority by conducting court proceedings in the absence of counsel for one or both parties and exerting undue, improper pressure upon a defendant to plead guilty.

"1. In late 1974-early 1976, former Deputy Public Defender Vernon Putnam was involved in a proceeding in another division when he was summoned to appear in Respondent's courtroom. Mr. Putnam finished his appearance and proceeded to Respondent's courtroom where his client's motion to declare a prior conviction unconstitutional was on calendar. When Mr. Putnam entered Respondent's courtroom, he discovered his client seated in the witness chair giving testimony in response to questioning by either Respondent or the prosecutor.

"Mr. Putnam objected to the impropriety of commencing the hearing in his absence. Following argument between Respondent and Mr. Putnam, Respondent disqualified himself, and the matter was transferred to another division for a de novo hearing. Respondent's explanation was that his court was busy, Mr. Putnam had not responded to the summons, so Respondent had started without him.

"2. During a case heard by Respondent between 1975 and the first part of 1976, then Deputy Public Defender James Tucker arrived in Respondent's courtroom and discovered that the hearing on his client's motion to suppress evidence had commenced without him. When Mr. Tucker arrived, the police officer witness was on the witness stand being examined by Respondent, and the defendant was seated at counsel table. Mr. Tucker objected to Respondent's commencement of the hearing in his absence. Respondent offered to start over, but subsequently transferred the matter to another division.

"3. Between approximately April 1978 and October 1979, when the prosecutor was late returning to Respondent's courtroom after lunch, Respondent continued with the voir dire of the veniremen in the prosecutor's absence.

"4. On or about March 23, 1976, in the case of *People* v. *Frank O. Ortega,* the prosecution moved to dismiss the case against defendant Ortega, who had wrongfully been arrested and was being held in custody. Respondent said he would grant the motion to dismiss the case only if the defendant agreed not to sue the county for false arrest. When Deputy Public Defender Bruce Hoffman complained that his client was being coerced because he was in custody, Respondent replied that he was a taxpayer and that he was acting in the taxpayers' and the county's best interests.

"V. (Count V, Paragraphs 2, 3, 9, and 15)

"Respondent has repeatedly conducted court business in a manner which ignores procedures required by law and essential to the fair, orderly, and decorous administration of justice.

"1. Respondent has left the bench abruptly during proceedings in his courtroom. On two such occasions during 1977-1978, he instructed counsel for the parties to continue adducing testimony while he was gone and to note their objections to the testimony in writing so that he could rule on the objections when he returned to the bench. In each instance—once in a jury trial and once in either a court trial or a preliminary hearing—testimony continued during Respondent's absence from the court.

"2. On or about May 25, 1978, in the case of *People* v. *Rebecca Hernandez* (S.A.A.C. No. 6076), Respondent dismissed the charges and declared a county ordinance unconstitutional in a press release issued in chambers, outside regular court hours, without notice to or appearance by the prosecution and without appearance by the defendant.

"3. Between 1972 and 1977, Respondent occasionally entered the jurors' room during their deliberations and in the absence of either counsel for the People or for the defense, or both, and without valid legal cause. Inside, Respondent discussed issues material to the cases upon which the juries had been deliberating. Respondent admitted in testimony that he 'wasn't concerned if the District Attorney wasn't present . . . .'

"4. On one occasion, Respondent informed the Public Defender's office that, on the forthcoming Thursday, he would impose only one-half of his customary sentence or fine in cases

ters on behalf of friends and benefactors. (Finding I.[3]) In People v. Frank Terrones and in People v. Kasparian, Judge Gonzalez contacted the deputy in charge of the district attorney's office in East Los Angeles and attempted to induce him to dismiss criminal charges. In Terrones (Count III, ¶ 3(c)[4]) he acted at the behest of a law enforcement official; in Kasparian (Count III, ¶ 3(a)) he sought to help an influential friend whose son had been arrested. Though certain factual details were disputed, petitioner concedes that he often approached district attorneys to urge dismissal. The following quotation from his testimony epitomizes Judge Gonzalez' judicial philosophy on this issue: "[I]f [a legislator, a sheriff, a political chairman] . . . if anyone who helped me or a brother judge on the bench were to call me and say, 'Mike, what can you do for this

where the defendant pleaded guilty. All the deputy public defenders took advantage of Respondent's prospective offer, by advancing their cases on calendar to coincide with the appointed 'Bargain Day.' Respondent indeed imposed one-half the customary fines upon defendants pleading guilty on that day.

"On this occasion or a second, Respondent also announced the identical offer to a courtroom full of defendants. In neither announcement did Respondent limit his proposed deal to one-point vehicle infractions; on the contrary, it actually applied to misdemeanors.

"*VI. (Count VI, Paragraphs 1, 3, 4, 5, and 6)*

"Both in open court and in private communications with persons associated with the court, Respondent improperly engaged in personal verbal attacks, indulged in indelicate sexual and ethnic remarks, and made comments which cast doubt upon his appreciation of the nature and importance of his judicial duties and his ability to sit as a fair and impartial judge.

". . . . . . . . . . . . . . . . . . .

"1. During pronouncement of a judgment on a tall, large male of Mexican extraction, on the charge of beating his wife, who was small in stature, the Respondent stated such a course of conduct may be tolerated in Mexico and Africa but would not be tolerated in America.

"2. During jury voir dire in a criminal case in June or July, 1979, while questioning an Asian venireman about inflation, Respondent commented that he did not know why he was speaking to a Japanese juror about inflation because 'What do fishheads and rice cost?'

"3. During jury voir dire in a criminal case in approximately August or September, 1980, a black woman on the panel responded that she was a clerk at Safeway, and Respondent next asked her, 'What is the price of watermelon per pound?' The deputy district attorney winced at the question, and later advised Respondent that the question could be offensive to some blacks. Respondent, however, repeated the same question to the same black woman upon her appearance among a subsequent group of panel members.

". . . . . . . . . . . . . . . . . . .

"4. In Judge Gilbert R. Ruiz' chambers in April or May, 1980, Respondent answered Deputy District Attorney David Milton's disclosure of his wife's miscarriage by saying, 'Oh, good. One less minority,' or words to that effect. Thereafter, Respondent apologized.

"5 On December 19, 1979, at a Christmas party attended by most of the courthouse personnel, Respondent asked a Jewish deputy district attorney, Wendy Widlus, 'Tell me something, Wendy, with all the interbreeding that your people do, aren't you afraid that they will produce a race of idiots?' Ms. Widlus was offended, very angry, and considered the remark to be tasteless as well as anti-Semitic.

"*VII. (Count IV)*

"During the period of September, 1977 through April 1980, Respondent persistently made improper and unwanted sexual advances toward Maria Rody Moreno, an interpreter assigned to the East Los Angeles Municipal Court."

[3]"Findings" refer to the Commission's findings of fact and conclusions of law, rendered April 30, 1982.

[4]"Counts" refer to the original charges filed by the Commission in its notice of formal proceedings of December 22, 1980.

matter?' I'm going to tell them all the same thing, you know, that I can't dismiss it on my own motion. 'So let me refer you to the D.A. and see if what, if anything, he can do.' And I don't care whether the D.A. dismisses it. I don't care whether the D.A. tells me to go to hell. I don't care whether the D.A. calls up the Assemblyman and the doctor and the sheriff and tells them to go to hell.

"I have cemented relationships between the person who referred that individual to me. And that person, if he was in chambers . . . will go back and tell his judge friend, 'Judge, I appreciate your opening the door of Judge Number 45. And I certainly appreciate Judge Number 45 trying to do what he can, too. But it was that dirty no-good D.A.'

"The referring judge gets points with his friends. I make points with the judge, the D.A., the Assemblyman, the doctor, the sheriff, whoever it is. *And that's the little game we play in the criminal justice system.*" (Italics added.)

In Terrones and in Kasparian, Judge Gonzalez intentionally exploited his judicial office to attempt to influence the disposition of criminal matters. His conduct therefore constitutes wilful misconduct.[5] (*Spruance, supra,* 13 Cal.3d at p. 798.) As a matter of law he has also violated canon 2B of the Code of Judicial Conduct, which provides that "A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him . . . ." In *Spruance* we held a similar violation of canon 2B to constitute wilful misconduct. (13 Cal.3d at p. 798.) Petitioner's insistence that he "saw nothing judicially improper" about his conduct cannot preclude a charge of wilful misconduct, for that term embraces intentional conduct that a judge *should have known* was beyond his judicial authority. (*Geiler, supra,* 10 Cal.3d at p. 286.) Petitioner's patent misunderstanding of the nature of his judicial responsibility serves not to mitigate but to aggravate the severity of his misconduct.

### 2.

The record also supports the finding that Judge Gonzalez has acted improperly, unreasonably, and arbitrarily in matters of bail-setting and own-recognizance (OR) release. (Finding II.) On two or three occasions, as petitioner has admitted, he offered to grant OR motions which he had originally denied if defense counsel—in each case a public defender—would post a personal check in the amount of $25, payable to counsel's favorite charity, which he would hold and return on termination of the case. (Count I, ¶ 1.) Similarly, in the case of People v. Williams, petitioner informed the private attorney ap-

---

[5]Where we find that petitioner's actions constitute wilful misconduct as a matter of law we also find that he has committed the lesser included offense of conduct prejudicial.

pointed to represent defendant that he would grant the OR motion on condition that the attorney post his own $50 in cash as bail. (Count I, ¶ 3.) Judge Gonzalez apparently reasoned that defense counsel could best prove trust and confidence in their clients by risking their personal funds. He further explained that his purpose was "both psychological and educational."

The legal impropriety of Judge Gonzalez' conduct on these occasions is obvious. He caused attorneys who did accede to the personal check policy to violate rule 5-104(A) of the Rules of Professional Conduct, which provides: "A member of the State Bar shall not directly or indirectly pay or agree to pay, guarantee, or represent or sanction the representation that he will pay personal or business expenses by or for a client . . . ." On the other hand, a defense attorney's refusal or inability to post the necessary sum might seriously strain the attorney-client relationship by undermining the client's trust in his or her attorney. Moreover, by purporting to "educate" young public defenders to the realities of criminal defense practice, Judge Gonzalez impermissibly sought to use his judicial office to further a "purpose other than the faithful discharge of judicial duties." (*Spruance, supra,* 13 Cal.3d at p. 796.) For these reasons, his action clearly constitutes wilful misconduct.

The record further reveals that in 1975, in People v. Williams, Judge Gonzalez refused to hear an OR motion on the merits, but offered to grant the requested release as a special or personal favor to the public defender. (Count I, ¶ 2.) At the hearing before the masters the private attorney of record in the case, who had not appeared before petitioner on the matter but who had instead asked the public defender to make the motion in his place, corroborated the testimony of the complaining public defender. Although the examiners concede that the public defender was not the attorney of record, petitioner bogs down in · irrelevant arguments concerning the identity of the attorney of record and fails to address the substance of the allegation itself. The fact remains that Judge Gonzalez offered to grant the requested OR release as a favor and refused to hear the argument on the merits. He was acting in his judicial capacity and knew or should have known that such conduct was beyond his lawful power. (*Geiler, supra,* 10 Cal.3d at p. 286.) Thus petitioner acted in bad faith and his action constitutes wilful misconduct.

Finally, in People v. Manuel Cruz Cerda, following a motion to dismiss by the People, Judge Gonzalez questioned the defendant directly on the facts of the case. When the public defender objected that his client was being interrogated on matters relating to guilt or innocence and instructed his client not to answer, he immediately fixed bail at $500, set a pretrial date, and refused to entertain the defendant's OR release motion. (Count I, ¶ 5.) Petitioner contends first that he does not remember the incident, and alternatively that Judge Ruiz, then in charge of the district attorney's office, must have requested that defendant

stipulate to probable cause. Again, however, petitioner's defense is speculative and unpersuasive, and again he fails to grasp the heart of the matter. Petitioner was not charged with unfairly demanding that the defendant stipulate to probable cause in return for a dismissal; he was charged with improperly refusing to hear the defendant's bail motion after turning down the prosecution's motion to dismiss. The evidence suggests petitioner refused to hear the motion because it was the public defender who had "opened his mouth" during the judge's questioning of the defendant. Such hostile, arbitrary, and unreasonable conduct jeopardizes the liberty of an indigent defendant for reasons not related to the merits of the case and therefore constitutes wilful misconduct. (*Spruance, supra,* 13 Cal.3d at pp. 795-797.)[6]

### 3.

We also find ample support in the record for the conclusion that Judge Gonzalez has made insulting and derogatory comments from the bench and in chambers impugning the character and competence of his judicial colleagues. (Finding III; count VII, ¶ 4.) Respondent presents uncontroverted evidence proving that on several occasions petitioner made grossly unflattering remarks regarding the physical appearance, impartiality, and work habits of his fellow judges. He insinuated that one judge had accepted a bribe and admitted to calling another judge a "coward" to his face.

By his actions Judge Gonzalez has violated canon 2A of the Code of Judicial Conduct, which requires that judges conduct themselves "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Petitioner's brash criticisms and colorful insults were manifestly uttered in bad faith while petitioner was acting in his judicial capacity. (*Spruance, supra,* 13 Cal.3d at p. 796.) His actions therefore constitute wilful misconduct.

### 4.

The record further reveals that Judge Gonzalez has engaged in a continuous course of overreaching and abuse of judicial authority. (Finding IV.) First, we find that petitioner conducted court proceedings on three occasions in the absence of counsel for one or both of the parties. (Count III, ¶¶ 1a, 1b, and 1b'.) Each of the three complaining attorneys testified that when he entered petitioner's courtroom he found that petitioner had actually begun proceedings without him.

---

[6]Furthermore, we have held that extended and improper examination of witnesses by a judge places the judge in the role of advocate and may detract from the public image of the court as an impartial tribunal. (*McCartney* v. *Commission on Judicial Qualifications* (1974) *supra,* 12 Cal.3d 512, 533.)

Judge Gonzalez denies the allegations but fails otherwise to impeach the attorneys' testimony. In a tone that rapidly grows tiresome, he reiterates a conspiracy theory typically raised as a defense in judicial misconduct investigations, and contends that the three attorneys simply fabricated their stories. As he does with virtually every allegation, Judge Gonzalez fundamentally misperceives the nature and gravity of the charge and instead views the entire matter as one of political disagreement or personality difference. His own testimony candidly displays his disdain for the three attorneys involved in this allegation: "I've never had a rapport as being an ex-cop and a judge in the very same courthouse wherein I was an ex-cop. I've never had a rapport with what I consider to be liberal-minded-orientated [*sic*] individuals, and [the three complaining attorneys are] those kinds of people. And a person of my background and philosophy could never cut it with [them]." Moreover, Judge Gonzalez repeatedly boasts an abhorrence of tardiness and may well have thought he was justified in penalizing recalcitrant attorneys by his actions.

It is obvious that conducting judicial proceedings in the absence of counsel for one of the parties seriously interferes with the attorney-client relationship and may also infringe on the right of the accused to effective representation by counsel. Though petitioner may not have intended to harm the interests of any of the parties involved, he acted intentionally and in bad faith. (*Spruance, supra,* 13 Cal.3d at p. 796; *Geiler, supra,* 10 Cal.3d at p. 286.) He has therefore engaged in wilful misconduct.

We also find that in the People v. Frank O. Ortega case Judge Gonzalez improperly conditioned dismissing a case against the defendant—who the district attorney conceded should not have been in custody—on the defendant's stipulation to the validity of the arrest. (Count III, ¶ 2c.) In fact the defendant in that case had mistakenly been arrested for failure to appear pursuant to a citation that did not call for his appearance until two days following the arrest. Because the defendant had spent two days in jail, the People acceded to the public defender's request that the charges be dismissed. Petitioner nonetheless conditioned dismissal on the defendant's stipulation to probable cause, explaining to the public defender that he was acting as a taxpayer in the best interest of the county. Despite some protestations that he did not remember the case, Judge Gonzalez essentially conceded the accuracy of the testimony on this allegation.

By way of defense or explanation petitioner relies on *Hoines* v. *Barney's Club, Inc.* (1980) 28 Cal.3d 603 [170 Cal.Rptr. 42, 620 P.2d 628]. But *Hoines* sustains the *prosecutor's* prerogative—not the court's—to condition consent to a dismissal of charges on a stipulation of probable cause for arrest. (*Id.* at p. 611.) Nothing in *Hoines* suggests that when a prosecuting attorney declines to request a probable cause stipulation because the defendant had mistakenly been taken into custody and held in jail for two days, a judge may compound

the injustice by insisting on the stipulation. Judge Gonzalez acted deliberately and unreasonably. His action is a form of judicial coercion and constitutes wilful misconduct as a matter of law.

5.

Next, we find the record discloses that Judge Gonzalez has conducted court business in violation of proper judicial procedures, to the detriment of the fair, orderly, and decorous administration of justice. (Finding V, count V, ¶¶ 2, 3, 9, 15.) Specifically, petitioner has left the bench on several occasions during court proceedings, instructing counsel to continue adducing testimony in his absence and to note any objections in writing so that he might rule on them on his return. (Count V, ¶ 2.) As was customary in petitioner's chambers, on most of these occasions there was no court reporter to help reconstruct the questions asked or the objections taken. Judge Gonzalez denies the allegation and calls the examiners' witnesses "liars." His bailiff and clerk corroborated his denial.

As noted earlier, the standard of proof governing our review of the evidence is the "clear and convincing" standard first articulated by this court in *Geiler*. In resolving the credibility contest surrounding this allegation, we find, contrary to petitioner's claim, no evidence in the record that any of the examiners' three witnesses ever engaged in any "conspiracy" against petitioner. With no motive to lie or fabricate, each witness testified, under oath, to observing judicial conduct so unusual that even the casual observer would have remembered it plainly.

By leaving the bench during judicial proceedings Judge Gonzalez has demonstrated a flagrant lack of respect for his judicial office, in violation of the general provision and spirit of canon 3 of the Code of Judicial Conduct. If only for a few moments at any one time, on these occasions he abandoned his role in the adjudicative process in utter disregard for his obligation diligently to perform the duties of his office. As such, his unjudicial behavior rises to the level of wilful misconduct.

Judge Gonzalez further demonstrates his disregard for proper judicial procedures by his highly unorthodox and patently improper disposition of the case of People v. Rebecca Hernandez. (Count V, ¶ 3.) The facts regarding this matter are virtually undisputed. The defendant was cited for violating the county dog leash and license ordinance, and failed to appear on the appointed court date. In chambers, on the evening of May 25, 1978, petitioner on his own initiative dismissed the case and declared the ordinance unconstitutional on its face. No notice or opportunity to be heard was afforded the People; no motion had ever been made by the defendant. Judge Gonzalez merely issued what he described in his testimony before the masters as "an opinion in the form of a

press release." In an almost farcical misapplication of constitutional law, Judge Gonzalez declared that the dog leash/license ordinance violated the equal protection clause of the Fourteenth Amendment because it applied to dog-owners but not to owners of "(a) Canaries, (b) Chinchillas . . . (k) Mynah birds . . . (o) Squirrel monkeys, (p) Steppe legal [*sic*] eagles, (q) Toucans . . . " and so on. Although Judge Gonzalez sought to start the entire proceeding over so that any appeal taken might reach substantive issues, the district attorney refused to forego immediate review and petitioner's ruling was reversed because of its procedural impropriety.

Petitioner openly admits and defends his action: ". . . I did it under the theory that the statute was unconstitutional on its face, and a judge is permitted to do that if that be the case . . . . As for that, it can be ex parte. That is the law." Yet, not surprisingly, petitioner does not cite any legal authority for the untenable conclusion that a judge may dispose of cases and invalidate legislation without affording the parties an opportunity to participate. By his flagrant and deliberate disregard for even the minimal requirements of fairness and due process petitioner has far exceeded the bounds of his judicial authority. (*Geiler, supra,* 10 Cal.3d at p. 286; *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 694 [122 Cal.Rptr. 778, 537 P.2d 898].) Furthermore, the facts strongly suggest that as a candidate for election to the superior court at the time of this ruling, Judge Gonzalez was motivated by a desire for preelection publicity. Though his "press release opinion" may indeed have earned him a certain political notoriety, such a blatant exploitation of the judicial office for political ends seriously and impermissibly undermines public esteem for the impartiality and integrity of the judiciary. While petitioner apparently fails to appreciate the gravity of his transgression, we hold his action to constitute wilful misconduct as a matter of law.

We also find that Judge Gonzalez has disregarded proper judicial procedures by entering the jury room during deliberations without counsel for both parties. (Count V, ¶ 9.) The examiners presented three witnesses who testified in significant detail that Judge Gonzalez repeatedly entered the jury room while the jury was deliberating. Petitioner admits he entered the jury room, but denies he ever did so in the absence of defense counsel: "I've never gone in by myself. I've never gone in without cause just to see what they're doing, not without exception of the times that I've gone into the jury room when one or both or all three of us were present. I wasn't concerned if the D.A. wasn't present, but I was always concerned if the defense attorney wasn't present."

Petitioner denies the impropriety of any of his entries into the jury room. He cites *People* v. *Vinson* (1981) 121 Cal.App.3d 80, 84 [175 Cal.Rptr. 123], for the proposition that a private communication between a judge and juror does not necessarily constitute reversible error. However, once again Judge Gon-

zalez fails to grasp the heart of the matter. He has not been charged with committing reversible error by his actions, nor is this the standard for determining whether his misconduct is sanctionable. Rather, petitioner was charged with having "conducted . . . court business in a manner demonstrating ignorance of and indifference to procedures required by law which are essential to the fair, orderly, and decorous administration of justice." It is of course well established that "private communication between court and jury are improper, and that all communications should be made in open court." (*People* v. *Alcalde* (1944) 24 Cal.2d 177, 189 [148 P.2d 627]; see also *Paulson* v. *Superior Court* (1962) 58 Cal.2d 1, 7 [22 Cal.Rptr. 649, 372 P.2d 641].) Although informal communications between judge and jury may not result in reversible error if an appeal is in fact taken, for our present purposes it is important to stress that such communications do interfere with the parties' right to the assistance of counsel and do undermine public esteem for the integrity and impartiality of the judicial office. The evidence in this case clearly establishes Judge Gonzalez' patent indifference and disrespect for settled judicial practices. He certainly should have known his jury room visits were beyond his lawful powers. (*Geiler, supra,* 10 Cal.3d at p. 286.) We, therefore, find these actions constitute wilful misconduct.

Finally, we find that Judge Gonzalez improperly disregarded judicial procedures by announcing in open court, and later holding, a so-called half-off sentencing "bargain day" for persons pleading guilty. (Count V, ¶ 15.) Petitioner admits he made the blanket offer but maintains it was limited to Vehicle Code violators. We find that in fact he extended the offer more broadly to include misdemeanants, some of whom were represented by public defenders who advanced their cases on the calendar to coincide with "bargain day." Judge Gonzalez defends his use of the *en masse* plea bargaining technique by pointing to the court's congested calendar and by claiming to have sought "a couple of dollars for the county and a conviction for the state."

By his wholesale plea bargaining scheme Judge Gonzalez has deliberately misused his otherwise lawful power to reduce sentences and fines in individual cases. As we pointed out in *Geiler,* even the admirable goal of expediting judicial procedures cannot justify the court's abrogation of its duty to determine each case on its own merits. (10 Cal.3d at p. 285.) Judge Gonzalez' further declared aims of filling the county coffer and scoring convictions for the state are of course completely extraneous to the administration of justice. Judge Gonzalez certainly should have known that his "bargain day" sentencing offer—even if limited to vehicular offenses—contravened the principle of individualized sentencing embodied in our Penal Code. (Pen. Code, § 1203 et seq.) We therefore find his action constitutes wilful misconduct as a matter of law.

6.

██ The record also reveals that both in open court and in private communications with persons associated with the court Judge Gonzalez improperly engaged in personal verbal attacks, indulged in indelicate sexual and ethnic remarks, and made comments that cast doubt on his appreciation of the nature and importance of his judicial duties. (Finding VI.) On pronouncing judgment on a male of Mexican extraction on a charge of beating his wife, petitioner stated that although such behavior might be tolerated in Africa or Mexico, it would not be tolerated in America. (Count VI, ¶ 6.) During jury voir dire in a criminal case he questioned a Japanese venireman about inflation and then commented that he did not know why he was speaking to a Japanese juror about inflation, because "what do fishheads and rice cost?" (Count VI, ¶ 3.) During another jury voir dire in a criminal case petitioner asked a black woman on the panel who had said she worked as a grocery clerk if she knew the price of watermelon. (Count VI, ¶ 4.) In a colleague's chambers petitioner responded to the news that a black district attorney's wife had had a miscarriage by saying, in essence, "Oh good, one less minority." (Count VI, ¶ 1.) Finally, at a Christmas party attended by most of the court personnel petitioner asked a female Jewish district attorney whether "with all the inbreeding your people do, aren't you afraid that they will produce a race of idiots," or words to that effect. (Count VI, ¶ 5.)

Petitioner vigorously insists that any ethnic or sexual remarks he may have made were made in jest, and that in fact he has never treated ethnic or minority groups unfairly. However, Judge Gonzalez' subjective intent is not at issue. As a judge he is charged with the obligation to conduct himself at all times in a manner that promotes public confidence and esteem for the judiciary. Particular friends or associates may assure themselves that the judge's ethnic remarks are made in jest, but such facially blatant ethnic slurs as those Judge Gonzalez uttered from the bench are apt to offend minority members not familiar with petitioner's views and may be construed by the public at large as highly demeaning to minorities. Regardless of his personal feelings on racial harmony or the propriety of ethnic humor, Judge Gonzalez should have known that his admittedly "salty" courtroom comments were unbecoming and inappropriate. The ethnic slurs uttered from the bench constitute unjudicial conduct by a judge acting in his judicial capacity and are therefore sanctionable as wilful misconduct. (*Geiler, supra,* 10 Cal.3d at pp. 283-284.)

The comment made off the bench regarding the black district attorney's wife's miscarriage and the Christmas party Jewish remark pose a less serious threat to public esteem for the integrity of the judiciary. However, as held in *In re Stevens* (1982) 31 Cal.3d 403 [183 Cal.Rptr. 48, 645 P.2d 99], ethnic and racial epithets uttered in chambers do constitute the lesser offense of conduct

prejudicial. (*Id.* at p. 404.) Derogatory remarks, although made in chambers or at a staff gathering, may become public knowledge and thereby diminish the hearer's esteem for the judiciary—again regardless of the speaker's subjective intent or motivation. The reputation in the community of an individual judge necessarily reflects on that community's regard for the judicial system. We hold that petitioner's "one less minority" and inbreeding remarks constitute conduct prejudicial to the administration of justice.

7.

Finally, we review the Commission's finding that during the period of September 1977 through April 1980 Judge Gonzalez persistently made improper and unwanted sexual advance toward a court interpreter assigned to the East Los Angeles Municipal Court. (Finding VII; count VI.) Petitioner disputes the factual finding of sexual harassment. After close scrutiny of the entire record we are not persuaded that the charge is supported by clear and convincing evidence. This charge of conduct prejudicial is therefore not sustained.

We have sustained all eighteen of the Commission's charges of wilful misconduct and two of its three charges of conduct prejudicial. We turn now to our most important responsibility, the decision whether to adopt the Commission's recommendation that Judge Gonzalez be removed from office.

In the final analysis Judge Gonzalez utterly fails to grasp either the substance or seriousness of the numerous charges levelled against him by the Commission. Despite multiple admonitions and the normal evidentiary limitations of the hearing process, Judge Gonzalez has treated this investigation as an attack on his character. Thus he boasts he is opinionated, outspoken, hardworking, and extroverted, but never prejudiced and always impartial. He persists in his theory that his adversaries conspired to record his every misdeed and regards virtually every allegation as personally motivated. Rather than respond affirmatively and convincingly to the specific charges, he expends most of his defense effort in attacking the character and credibility of the adverse witnesses. While he concedes there may be certain minor irregularities in his judicial manner and procedures, he denies he has ever deliberately abused his judicial office and generally refuses to admit he has done anything improper.

Judge Gonzalez reiterates his conspiracy theory and offers character evidence to mitigate punishment. Yet it is well established that there can be no mitigation for maliciously motivated judicial misconduct. (*Spruance, supra,* 13 Cal.3d at p. 800), and we have found that on numerous occasions Judge Gonzalez in fact acted in bad faith. We therefore give his claim of mitigating circumstances no significant weight.

Judge Gonzalez' misconduct has been persistent and pervasive. Because we recognize the important role that the municipal court judge plays in our judicial system, we cannot risk the recurrence of petitioner's misconduct. We therefore order that Judge Mario P. Gonzalez of the Municipal Court for the East Los Angeles Judicial District be removed from office effective on the date of finality of this decision.

We recognize that since the advent of the Commission on Judicial Performance the bench has been governed by a higher standard of conduct than the bar. (*Geiler, supra,* 10 Cal.3d at p. 287.) Because we do not find that Judge Gonzalez' misconduct rises to the level of moral turpitude, dishonesty, or corruption, we order that despite his removal from office he be permitted to practice law in California, on condition that he pass the Professional Responsibility Examination required of applicants seeking readmission or reinstatement to the bar. (Cal. Rules of Court, rule 952(d).) All attorneys who have been suspended from practice must pass this examination before being readmitted (*Segretti* v. *State Bar* (1976) 15 Cal.3d 878, 890-891 [126 Cal.Rptr. 793, 544 P.2d 929]), and we see no reason to exempt from this requirement a judge who, on removal from office, is automatically suspended from practicing law. (Cal. Const., art. VI, § 18, subd. (d).)