Springer, J.,
dissenting:
I dissent from this court’s order affirming the removal of Judge Davis from his judicial office. Although I have several grounds for dissenting, I dissent principally because the Nevada Commission on Judicial Discipline has exceeded its constitutional jurisdiction in ordering removal. I am in complete agreement with Commissioner Griffin, who “disagree[d] that removal is warranted” and voted that, instead of being removed from office, Judge Davis should be “issued a censure, be required to attend courses in ethics and be fined.”
The several reasons for my dissent are as follows:
1. Constitutional Invalidity of the Removal Order. Article 6, section 21(6) of the Nevada Constitution provides that no judge may be removed “except for willful misconduct, willful or persistent failure to perform the duties of his office or habitual intemperance.” The complaint does not charge Judge Davis with any conduct that would subject him to removal under the Nevada Constitution. The Commission made no findings or conclusions relative to the required willful misconduct, persistent failure to perform judicial duties or habitual intemperance; and, as a consequence, the Commission is without the constitutional power to remove Judge Davis.
2. Manifest Excessiveness of Penalty. Commissioner Griffin recognized what the other Commissioners apparently did not, namely, that the charges in this case range from minor (borrowing money from court staff members) to trivial (playing “inappropriate songs” such as “Jail House Rock” in his chambers). The Commission itself declined to “discipline the respondent for [certain charged acts] without first giving him the opportunity to remedy that conduct.” I served on the Commission for a ten-year period and believe that I can take notice of the fact that minor derelictions of the kind involved here are properly and customarily dealt with by advising the erring judge to discontinue the conduct and “giving [the judge] an opportunity to remedy that conduct.” That Judge Davis would be permanently removed from office (even if it were constitutionally permissible for the Commission to do so) without being afforded an opportunity to change objectionable behavior is unthinkable under the circumstances of this case.
3. Selective Prosecution. Judge Davis has, unlike other *1230 judges who have been charged with relatively minor infractions of the Code of Judicial Conduct, been subject to the most severe penalty allowable. From this and other aspects of the prosecution of Judge Davis, I conclude that he has been the victim of selective, prejudicial prosecution. In the many cases of minor derelictions and minor deviations from proper judicial conduct that I have witnessed during my service as a judicial discipline commissioner, the kinds of misbehavior charged here would, unexceptionably, be handled by warning or, at most, by private reprimand. The rational, unpolitical way of handling this case would have been to go to Judge Davis and tell him that there had been reports of unacceptable conduct which, if true, must be remedied immediately. It has been my experience that such a warning works in almost every case. If formal proceedings were thought to be unavoidable under the circumstances of this case, it still seems clear to me that this is not the kind of case that even comes close to providing cause for permanent removal from the bench; and I cannot conceive of removal being ordered in this case absent the interjection of political motivations or other unwarranted, prejudicial considerations.
I find in this record no indication that Judge Davis had been guilty of recurrent misconduct or of previous commission of the kinds of delicts that resulted in removal proceedings in this case. As stated above, I find nothing that would make me think that this case could not have been expeditiously resolved simply by saying something to Judge Davis like this: “Judge Davis, it has come to our attention that you have been engaging in some kinds of conduct that are not fitting for a judge — please discontinue these practices, or you are going to be subject to formal disciplinary proceedings.” There is only one thing in this entire record that gives even a hint as to why or how these relatively trivial charges were so magnified and ended up in Judge Davis’ being permanently removed from office, and that is that he “flunked the attitude test,” that he made the Commission members so angry with him that they decided to “throw the book” at him. It is quite apparent that Judge Davis believed that he was the object of a witch hunt. This made him resentful and did reflect in his attitude toward the Commission. Judge Davis was successful in making all of the members of the Commission mad at him; but, obviously, this does not provide grounds for the ultimate judicial discipline, removal from office. It is very much to the credit of Commissioner Griffin (who, as I read the record, was also angry at Judge Davis) that he was able to set aside this anger and arrive at what is arguably a fair result in this case — admonish, perhaps discipline, but not remove Judge Davis from office.
Aside from my personal experience, I do not think that many *1231 persons who are familiar with the judicial discipline process would come to a conclusion different from mine or would think that a judge should be removed from office except, of course, in cases of very serious misconduct, until she or he had an ample opportunity to correct objectionable judicial behavior. Clearly, where the misconduct persists, formal proceedings may become necessary, but, under the rules in effect during these proceedings, it is only in cases where there is willful misconduct or willful or persistent failure to perform judicial duties that removal is warranted. As pointed out in this dissent, there is no willful or persistent misconduct involved here.
Judge Davis has been singled out for special, uncalled-for draconian punishment. There are two aspects to this discrimination — one is that judges charged with similar conduct have been unexceptionably treated with sympathy and understanding rather than removal from office; the other is that in the past judges who appeared to have been involved in much more serious judicial misconduct than what was charged against Judge Davis have not only escaped removal from office but have escaped the judicial disciplinary process entirely.
With respect, first, to the Commission’s historically sympathetic approach toward judges who face charges more serious than those levied against Judge Davis, I point to the case of “Judge D” (a fictitious designation), referred to throughout the Whitehead case. See, e.g., Whitehead v. Comm’n on Jud. Discipline, 111 Nev. 70, 893 P.2d 866 (1995) (“Whitehead II”); Whitehead v. Comm’n on Jud. Discipline, 110 Nev. 380, 873 P.2d 946 (1994) (“ Whitehead/”). The Judge D case began when a judge filed a formal complaint against a fellow judge, stating many instances of serious judicial misconduct. “[Ajfter receiving a sworn complaint against Judge D, the Attorney General investigated the matter and obtained numerous (reportedly approximately thirty to forty) written, signed statements of the [complaining] witnesses.” Whitehead II, 111 Nev. at 134, 893 P.2d at 905.
The gist of the complaint against Judge D was, according to a Commission newsletter, multiple “angry outbursts . . . from the bench and in chambers directed toward citizens, attorneys and court personnel.” This was the second such series of complaints that was filed against this judge; and it is very difficult to argue that these offenses, although not calling for removal from office, were not considerably more serious than those brought against Judge Davis.
Rather than proceeding to a probable cause hearing and making public the charges against Judge D, the Commission decided to hold secret hearings in which it was able to convince Judge D to *1232 “consent” to certain terms of “voluntary” discipline to be imposed by the Commission.
Among other things, the terms of discipline that the Commission imposed upon Judge “D — ,” after the extended, pre-probable cause, secret proceedings conducted by the Commission and the prosecutors, included the requirement that the judge undergo “psychological evaluations” and the requirement that the judge submit to “on-going counseling for anger-management” with the daughter of one of the Commissioners. (The minutes quite surprisingly reflect that “the Commission found no conflict” arising out of its order compelling Judge “D — ” to counsel with the Commission member’s daughter. The record does not reveal the sums of money that Judge “D — ” expended for the professional services rendered either by the Commissioner’s daughter or other professional counsellors which the judge was required to consult; we know only that the judge was specifically directed to continue anger-counseling with the daughter for a period of eight months.)
Whitehead 1, 110 Nev. at 419, 873 P.2d at 970.
In addition to “anger counseling,” Judge D agreed to be placed “on probation” to the Attorney General for eighteen to twenty-four months and to submit to a public censure, all of which constituted a disciplinary disposition very much like that proposed in this case by dissenting Commissioner Griffin.
Given the fact that Judge Davis was not given the favor of having the kind of secret session with the Commission afforded to Judge D, and given the failure of the Commission to give Judge Davis an opportunity to correct any misbehavior that might have been found by the Commission, it seems very clear to me that the prosecution of Judge Davis was selective and discriminatory — to such a degree that fairness demands a remand of the entire matter to the Commission so that Judge Davis can be given the same sort of kindly consideration that was given to Judge D.[1]
As to the other mentioned aspect of discriminatory treatment at the hands of the Commission, the failure of the Commission to discipline judges who are involved in truly serious judicial misbehavior, I make reference to a “Table of Disciplinary Oversights,” which I filed with the court on October 28, 1994. Accompanying that document I filed a statement declaring:
My examination of the secret Commission records . . . has led me to the conclusion that our system of judicial disci *1233 pline has broken down and has shown itself in recent times to have been incapable of carrying out its intended constitutional functions. The ineffectiveness of the judicial discipline process is particularly evident and destructive in the area of unethical campaign practices injudicial elections.
In the “Table of Disciplinary Oversights” I sampled some twelve instances of charges of serious judicial misconduct which not only were not the subject of removal proceedings but which, in most cases, resulted in no disciplinary action being taken at all. To cite just a few of the examples of unpunished misconduct, I would mention the following:
a. A judge was charged, under oath by another judge, (1) with racism (holding an hispanic gentleman in contempt of court and telling him he could “go to jail until he learned English”), (2) with a “pattern of discrimination against women, Spanish-speaking persons and Native Americans, (3) with physically assaulting and battering a female news reporter, (4) with unlawfully altering court records, and (5) with leaving the bench in a criminal case, telling the attorney to go ahead and present the evidence in his absence. The complaint against this judge was dismissed by the Commission, and the judge was not removed from office or otherwise disciplined in any way.
b. A sworn complaint was filed by one judge against another judge charging that during a political campaign the accused judge issued a number of false and slanderous statements about his opponent, portraying his opponent in paid political cartoons as an “animal” and a “monster,” and, among other things, falsely imputing to his opponent racist and other biases that had no basis in fact. This complaint received no hearing by the Commission and was dismissed without any consideration of the charged misconduct.
c. A sworn complaint was filed by one judge against another charging unethical and slanderous campaign practices in the form of depicting the complaining judge in judicial robes receiving cash money under the table. That the complaining judge was not in criminal receipt of money or other bribes was well known to the judge being charged with misconduct; yet the charged judge willfully published the false and defamatory political advertisements. This complaint, like the preceding complaint, was dismissed by the Commission, and no disciplinary action of any kind was taken against the charged judge.
d. A sworn complaint was filed against a jurist for violating Canon 2(B) of the Code of Judicial Conduct (“A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others . . . .”). The complaint charged that the jurist went to a prosecuting official on behalf of a friend and *1234 business associate and told that official that he would love to see the prosecution “go away.” If these allegations were true, they call for removal from office.[2] The complainant was not permitted a hearing and the complaint was dismissed by the Commission without further proceedings.
e. A judge was convicted of drunken driving but no judicial discipline was ever imposed by the Commission.
I think it is fair to conclude that Judge Davis’ case is an exception to the general rule. The rule is this: in relatively minor cases, judges are given an opportunity to amend their deportment and are not removed from office; and in cases of very serious acts of judicial misconduct, the acts of misconduct are ignored entirely. The discriminatory treatment of Judge Davis, of itself, warrants reversal of the Commission’s removal order.[3]
4. Due Process Violation. If I exclude unsavory political motivations as a possible explanation of the discriminatory treatment given to Judge Davis, the only thing that can explain why the Commission took such extreme action in his case is that Judge Davis made the Commission angry when he asserted his Fifth Amendment privilege. One reason that I think this is the case is because the Commission, protesting too much, denies that it was influenced by Judge Davis’s assertion of the privilege. (“The Commission emphasizes that in determining that the appropriate discipline for Judge Davis’ offenses is removal from office, it has not taken into consideration Judge Davis’ wrongful assertion of a blanket Fifth Amendment privilege.”) In reviewing this record, it is obvious that Judge Davis’ assertion of his privilege is the only plausible and available explanation for such an extreme reaction *1235 by the Commission. There is no other explanation for its taking such an excessive position.
The manner in which the Commission dealt with Judge Davis’ assertion of Constitutional privilege was to cite Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline (“ARJD”) 4, which requires judges to “cooperate with the commission when called upon to assist in any investigation or hearing or to testify concerning any matter.” Obviously, ARJD 4 does not require a judge to “cooperate with the commission” or to testify in a case in which the judge himself or herself is the defendant. The Commission even went so far as to take the position that a respondent/defendant judge may not “refuse to cooperate with the Commission or testify when called as a witness before it” and went on to proclaim that if an accused judge refuses to cooperate, “the Commission will deem such noncooperation to be an act of misconduct, subjecting the judge to discipline.” Put another way: Judges who are formally charged with misconduct are obliged to cooperate with their accusers and to testify if called as a witness; if they do not, this “refusal to cooperate” will be, in itself, “an act of misconduct.” Can the Commission be serious when it makes such outlandish pronouncements?
It is apparent to me that Judge Davis’ invocation of the Fifth Amendment so infuriated the Commission that its members (Commissioner Griffin dissenting) decided to impose the capital punishment of judicial discipline, removal from office. Whether or not Judge Davis had the right to refuse to testify at all (as would be his right had he been a criminal defendant) is a matter of no little difficulty and complexity. I would note that ARJD 11(3) provides that “in determining whether misconduct has occurred” the provisions of the Code of Judicial Conduct “must be considered as penalty provisions,” in other words, penal in nature. (Emphasis added.) One would think then that a respondent in judicial discipline proceedings would have the same rights as a criminal defendant to assert the privilege against self-incrimination and not be forced to be stultified by being required to answer such questions as “What is your name” and “When were you elected,” when the answers to such questions are already well known to the accusers.
Although I am convinced that Judge Davis had every right to refuse to testify, I stress the point that there was, and has been, no judicial ruling on that point in this state and that the Commission was clearly out of line when it ruled that “Judge Davis wrongfully refused to testify” and that Judge Davis “violated Rule 4 of the Administrative and Procedural Rules.”
As put in its Decision in this case, the “Commission has taken *1236 into consideration the manner in which Judge Davis behaved in wrongfully asserting a blanket Fifth Amendment privilege . . . The Commission had no right to conclude that Judge Davis “wrongfully” asserted his constitutional privilege and certainly had no right to remove him from office for asserting his rights under the state and federal Constitutions. That the Commission would remove Judge Davis from office because he “refused to cooperate” has a dire ring to it; and I believe the majority to be very wrong in permitting the Commission to get away with this kind of pernicious nonsense.
About the only remedy available to judges who might become victims of irrational and discriminatory Commission excesses is the state supreme court. Unfortunately, as further evidenced by this decision, that institution is in a state of serious disarray, and it is sadly apparent that there is no remedy for judges who are mistreated by the Commission on Judicial Discipline.
5. Possible Abuses of the Appellate Process. The question that I raise at this point relates to the fact that in September 1995, Judge Davis had, by majority vote, “won” his case before this court, and, in October 1997, Judge Davis, by majority vote, lost his case before the court.
The more direct question is whether delay was used as a device to maneuver the result in this case from a reversal of the Commission’s decision to an affirmance.
Although, of course, I have my own opinion concerning the question at hand, I make no judgment on the matter and raise the question, as I do, because I believe that Judge Davis has the right to know about these matters in order that he can be placed in a position to make further inquiry or to pursue a review of the matter in another forum, should he choose to do so.
At a minimum, I believe that Judge Davis is entitled to know the following:
Judge Davis’ case was decided[4] in his favor in September 1995, and re-decided, this time not in his favor, in September 1997. On September 10, 1995, a majority of the court voted to reverse the decision of the Commission, and, specifically, “to impose a lesser measure of discipline, mindful *1237 of the sanctions he has already experienced” and to “reinstate Judge Davis to his judicial office as a municipal court judge.” After the case was so decided, one of the justices held up the signing of the majority opinion for the expressed purpose of writing a dissent. No dissent was forthcoming, and at some time not known to me, but after Justice Steffen retired from the court in 1996, the minority, dissenting judge was able, in the absence of Justice Steffen, to secure a majority of the court to vote with the then dissenting justice to rule against Judge Davis and in favor of the Discipline Commission.
I know of only one previous instance in which a justice of this court wrote publicly about the ordinarily confidential internal workings of the court as I now do in this dissenting opinion. Although there are no formal rules on the subject, there are certain “traditions and norms of the appellate process,” which have, almost without exception, been honored by this court. State of Nevada v. District Court, 108 Nev. 1030, 842 P.2d 733 (1992). The only time in the history of this court that there has been a recorded departure from these customary traditions and norms of the appellate process is in the cited State v. District Court case (to be cited as “State”). In State, Justice Young was, as stated in the majority opinion, “admonished” by the court for engaging in a “most disturbing . . . breach of long-established standard of collegiality in appellate courts,” 108 Nev. at 1034, 842 P.2d at 736. The court ruled in State that Justice Young’s disclosures (disclosing theretofore inviolate confidential inner workings of the court) “reveal[ed] a total lack of appreciation of the traditions and norms of the appellate process.”
In State, this court severely chastised Justice Young for his insensitivity and lack of appreciation of court traditions and norms and admonished him for his “misleading characterization of the decision-making process of this court.” This court declared in its opinion censuring Justice Young that the court was “dismayed that Justice Young, who relies so heavily on his staff for production of his opinions,” would act in a manner that was so “contrary to established court protocol.”
I maintain that present disclosures to Judge Davis relating to the manner in which his case was treated are entirely different from the unwarranted disclosures that brought about the censuring of Justice Young in State. I would not do what I am doing if I thought that I was being, like Justice Young, guilty of a “breach of long-accepted standards of collegiality in appellate courts.” In my view the circumstances in the present case can be distinguished from those in State, in which Justice Young was merely peevishly charging that the court’s staff decided the case *1238 rather than the court and that the court’s staff “reached the conclusion” upon which the case ruling was based. Justice Young’s intemperate and false charges were based on nothing other than his angered dissatisfaction with the majority opinion and not upon the kind of “duty to disclose” that I believe to be present in this case.
This is not the first time that appellate jurists have been called upon to disclose certain ordinarily-confidential proceedings in the appellate process.[5] Whereas there was no apparent justification for Justice Young’s indiscretion in State, it appears to me that in this case it is imperative that Judge Davis be made aware of these matters. Judge Davis may or may not be able to construct a provable claim arising out of possible internal decision-making irregularities in the decision of his case; nonetheless, he is entitled to know what has been presented in this dissenting opinion.
I express no judgment on the chronology which I have outlined above, but the circumstances surrounding the decision-making process certainly lead to some possibly troubling inferences[6]; and it appears to me that Judge Davis has the right to pursue a claim that the case was held up until Justice Steffen retired and that there are unacceptable political overtones to this case that should be explored before the matter is finally put to rest.
*1239 6. Conclusion. There has been a great miscarriage of justice here; it is indeed unfortunate that the majority vote of September 1995 in Judge Davis’ favor does not represent the final decision of this court.

 The secret deal made by Judge D is only one example of the kinds of secret proceedings being conducted by the Commission in 1993 and 1994.

 See Gonzalez v. Com’n on Judicial Performance, 657 P.2d 372 (Cal. 1983) (en banc). This case involved the removal of California Judge Mario Gonzalez. Among other offenses committed by the judge, the California Supreme Court noted that “Judge Gonzalez contacted the deputy in charge of the district attorney’s office in East Los Angeles and attempted to induce him to dismiss criminal charges.” Id. at 376. The California Supreme Court held that “as a matter of law” Judge Gonzalez violated Canon 2B of the Code of Judicial Conduct, which provides that a judge “should not lend the prestige of his office to advance the private interests of others.” Id. at 377 (emphasis added). The sworn complaint was dismissed by the Commission without a hearing.

 The majority refers to my recounting of past Commission abuses as being merely a “regurgitation” of my prior criticisms of the Commission. It is probably true that I am “regurgitating” and restating complaints about the Commission which I have previously voiced; but I do this only in the hope that someone will come to the realization that the history of the Commission has been a history of abuses such as the one now before us. I hope that sometime someone will recognize that this is truly the case. This is the reason for my “regurgitations.”

 I must express a word of caution about my use of the word “decided.” Obviously, a supreme court case cannot be said to have been truly “decided” until the court’s judgment is filed and recorded. Consequently, when I say in the present context that the case was “decided” in favor of Judge Davis, naturally I mean only that a majority of the court voted in his favor. It is also true that after such a vote is taken, from time to time justices change their vote and thereby change the result in the case; accordingly, when I say that the case was “decided” in favor of Judge Davis, I am only saying that at one time he had a majority of the court on his side and that now he has a majority of the court against him.

 This is not the first time that an appellate jurist has been called upon by moral compulsion and sound legal principle to disclose legitimately the inner workings of an appellate court. I make reference to a book entitled Judging Judges, by Prebble Stoltz (The Free Press; Macmillan Publishing Co., New York, 1991). The subject of Judging Judges was a judicial discipline proceeding involving certain members of the California Supreme Court. The gist of these proceedings was that justices had delayed the judicial process for purposes extraneous to the decision-making process, namely, delaying the issuance of an opinion for political purposes. In the course of the mentioned proceedings, members of the California Supreme Court believed that they were justified in disclosing the existence of certain internal court documents, as I do here.
As stated in the text, I do not raise issues of judicial ethics relative to the manner in which the disposition in this case was changed from a ruling favoring Judge Davis to a ruling that results in his removal from office. My point, as I have stated, is that it is not fair to Judge Davis that such a radical alteration in the court’s decision, resulting in such extreme consequences to Judge Davis, should be allowed to follow from the court’s delay and from a change in the court’s membership.

 There are, of course, two ways of looking at this case. The majority, understandably, takes the position that the court, from time to time, makes tentative decisions which are later, on reconsideration, altered or even reversed. The majority is entitled to maintain that the present case is merely one of those cases in which the majority vote shifted (after Justice *1239 Steffen’s vote in favor of Judge Davis was lost) from one side to the other. On the other hand, Judge Davis might want to argue that this is a highly politicized case in which two biased justices, Justice Young (a former member of the Commission) and Chief Justice Shearing, who has been a steadfast supporter of the Commission’s side of things, particularly in the Whitehead case, decided to hold the case up until after Justice Steffen’s retirement, in the hope that they might be able to convince Justice Rose or Justice Steffen’s replacement to alter the previous decision.