946 P.2d 1033 (1997)
In the Matter of the Honorable Gary J. DAVIS, Municipal Court Judge, for the City of North Las Vegas, County of Clark, State of Nevada.
No. 27757.
Supreme Court of Nevada.
October 1, 1997.
*1035 Leonard I. Gang, General Counsel and Executive Director, and Frank Cremen, Special Prosecutor, Nevada Commission on Judicial Discipline, Carson City, for Nevada Commission on Judicial Discipline.
Davidson & Myers, Las Vegas, for Gary J. Davis.

OPINION
ROSE, Justice:
Appellant Gary J. Davis appeals findings of fact, conclusions of law, and the decision of *1036 the Nevada Commission on Judicial Discipline ("Commission") removing him from his judicial office as a municipal court judge. We conclude that the Commission properly acted within its discretion and affirm its determination in the matter.

FACTS
On November 22, 1993, two complaints were filed with the Commission against appellant Gary J. Davis, municipal court judge for the City of North Las Vegas.[1] Following a confidential probable cause hearing on August 2, 1995, the Commission found that there was probable cause for disciplinary action. Thereafter, a ten-count formal statement of charges was filed[2] on October 2, 1995:
1. That in violation of ARJD 11(3) and Canons 4(D)(1)(a) and 4(D)(1)(b), [appellant] borrowed money from court employees, including, but not limited to, Marilyn Bell, on January 24, 1985, the sum of $2,500.00; Linda Stiles, in August of 1993, the sum of $500.00; Don Cola, in August of 1993, the sum of $450.00; and Georgia Nunez, on repeated occasions, various sums including the sum of $500.00 on September 11, 1992, the sum of $260.00 on June 7, 1991, and the sum of $100.00 on February 21, 1991.
2. That in violation of ARJD 11(3) and Canon 5(A)(1)(b) of the Code of Judicial Discipline, [appellant], on or about August 5, 1994, publicly endorsed and campaigned for Robert Archie, a candidate for judicial office in the City of North Las Vegas.
3. That in violation of ARJD 11(3) and Canons 2, 4(D)(1)(a) and (b), [appellant] did, between the years of 1981 through 1993, conduct a personal business from [his] chambers in the North Las Vegas Municipal Court building by storing antiques therein and selling those antiques to persons likely to come before the court.
4. That in violation of ARJD 11(3) and Canons 2 and 4(D)(1)(a) and (b), [appellant] did, between 1981 and 1983, deliver [his] personal checks to the office of the clerk of [his] court and take cash from fines collected through the court, utilizing those funds for [his] own benefit for several days, and thereafter redeeming [his] personal check from the court.
5. That in violation of ARJD 11(3) and Canon 2(A), [appellant] did, from 1991 through 1993, cause to be played, from a jukebox in [his] chambers in the North Las Vegas Municipal court building, inappropriate songs such as "Jail House Rock" and other songs related to being in prison or jail in the presence of prisoners waiting for arraignment before the court.
6. That in violation of ARJD 11(3) and Canon 2(A), [appellant] did, sometime between December 9, 1992 and February 23, 1993, take Georgia Nunez of [his] court clerk's office and two uniformed court marshals to the automobile sales business of Friendly Ford in Las Vegas, Nevada, and there berate and intimidate an employee of that company because of [his] anger at not having yet received automobiles ordered for the court by the City of North Las Vegas, and that [he] did threaten that employee with never purchasing another vehicle from Friendly Ford.
7. That in violation of ARJD 11(3) and Canon 2(A) and Canon 4(A)(2) and (3), [appellant] did, between 1981 and 1993, on multiple occasions, direct court employees, including, but not limited to Georgia Nunez and Linda Roybal, during business hours, to leave the North Las Vegas Municipal Court premises and go to the nursery *1037 business owned by [his] mother to provide Spanish translating services, and that [he] did direct other court employees, including Don Cola and Linda Stiles, to perform other personal errands for [him] during court hours.
8. That in violation of ARJD 11(3) and Canons 1, 2(A) and 4(C)(3)(b)(i) & (iv), [appellant] did, from March, 1991 through February, 1992, direct or suggest to persons appearing before the North Las Vegas Municipal Court and having been found guilty by that court, to contribute to certain charities in lieu of paying fines to the City of North Las Vegas, thereby diverting money from the city treasury of North Las Vegas, which diversion was ordered partially for the purpose of enhancing [his] electability.
9. That in violation of ARJD 11(3) and Canons 2 and 3(B)(7), [appellant] did, on the 29th day of May, 1990, conduct an ex parte meeting with Patricia Brown, a defendant appearing before [him] that day, outside of the presence of the City Attorney of North Las Vegas, prior to the matter being heard in open court.
10. That in violation of ARJD 11(2) and ARJD 11(3) and Canons 1 and 2(A), [appellant] did, commencing in December 1993 and continuously thereafter, willfully and deliberately use property owned in part by [appellant] in North Las Vegas, Nevada that was zoned for residential purposes, for commercial purposes, after having been personally advised in writing by the Community Planning and Development Department of the City of North Las Vegas on July 14, 1993 of the proper zoning for that property. Further in conjunction with [the] commercial usage of this property, [he] did willfully and deliberately trespass on the property of the adjoining property owner for the purposes of hooking up water and sewer lines.
A formal hearing convened on November 2, 1995, and concluded the following day. The Commission then issued its final report, findings of fact, conclusions of law, decision, and imposition of discipline on December 4, 1995. The Commission found that clear and convincing evidence supported the factual allegations contained in each count of the formal statement of charges, with the exception of Count 9 (ex parte communication with defendant Patricia Brown). Additionally, the Commission concluded that these facts established violations of the specific provisions of the Nevada Code of Judicial Conduct ("NCJC") alleged in each count and that these violations constituted grounds for discipline.
The Commission also concluded that, although the conduct alleged in Count 4 (check cashing) had been established, appellant had discontinued the practice in a timely fashion; therefore, discipline would be inappropriate. The Commission was particularly concerned with Count 10, which it described as "particularly egregious" because appellant "deliberately and knowingly violated the very ordinances that he is obligated to enforce." Additionally, the Commission considered appellant's conduct at the formal hearing as "clearly and convincingly demonstrat[ing] his contumacious and contemptuous behavior towards the Commission."[3] By a vote of six of the seven Commissioners, the Commission ordered appellant's immediate removal from office.
Commissioner Michael R. Griffin filed a dissent to the imposition of discipline. Although Commissioner Griffin agreed with the Commission's findings, he concluded that removal from judicial office was unduly severe. Instead, he suggested that appellant's misconduct warranted substantial sanctions including a censure, attendance at an ethics course, and a fine. However, Commissioner Griffin stated "there is a serious question whether the Commission could impose lesser types of discipline on a Municipal Court Judge for conduct which occurred before the adoption of the recent amendments to the Nevada Constitution concerning the powers of the Commission."
*1038 On appeal, appellant seeks relief from the Commission's decision based upon the following grounds: (1) that the Commission lacked jurisdiction to impose discipline on a municipal judge; (2) that the Commission's rules violated his due process rights because there is no limitations period prescribing the time within which a complaint must be filed; (3) that the Commission improperly considered his assertion of a blanket Fifth Amendment privilege in deciding the appropriate discipline; (4) that the Commissioners who participated in the probable cause hearing were prejudiced against him and, therefore, should not have participated in the formal hearing and decision; (5) that the charges were not established by clear and convincing evidence; (6) that the charges did not constitute violations of the NCJC; and (7) that the discipline imposed was excessive.

DISCUSSION
We initially address the threshold issue of the Commission's jurisdiction to discipline a municipal court judge. The constitutional provision approved by the voters in 1976 created the Commission and provided that "[a] justice of the supreme court or a district judge may ... be censured, retired or removed by the Commission on judicial discipline." Nev. Const. art. 6, § 21(1) (emphasis added). In 1977 the legislature enacted NRS 1.440(1), which provides:
1. The Commission on judicial discipline has exclusive jurisdiction over the censure, removal and involuntary retirement of justices of the peace and judges of municipal courts which is coextensive with its jurisdiction over justices of the supreme court and judges of the district courts and must be exercised in the same manner and under the same rules.
(Emphasis added.) In 1994, paragraph 1 of section 21 of article 6 of the Nevada Constitution was amended to read: "A justice of the supreme court, a district judge, a justice of the peace or a municipal judge may ... be censured, retired, removed or otherwise disciplined by the Commission on judicial discipline." (Emphasis added.)
Appellant contends that the Commission lacked jurisdiction over municipal court judges prior to the 1994 constitutional amendment and, therefore, the Commission lacked authority to discipline him for conduct prior to 1994. Appellant's contention rests upon two assumptions: (1) NRS 1.440 was unconstitutional; and (2) retroactive application of the 1994 constitutional amendment to pre-1994 conduct violates the prohibition against ex post facto laws.

Constitutionality of NRS 1.440
The legislative history of NRS 1.440 is silent regarding the legislature's authority to enact the legislation.[4] The Commission contends that subparagraph 9(d) of section 21 of article 6 of the Nevada Constitution provides adequate constitutional authority for the legislature to enact NRS 1.440. The referenced provision states that the Commission may "[e]xercise such further powers as the legislature may from time to time confer upon it." Nev. Const. art. 6, § 21(9)(d). The Commission compares this provision to article 6, section 8, which allows the legislature to define the jurisdiction of the justices' courts. The Commission also contends that subparagraph 9(d) should be read to allow the legislature to give the Commission the power to discipline municipal court judges because municipal courts are legislatively created.[5]
Appellant contends that subparagraph 9(d) of section 21 of article 6 may not be read to permit the legislature to expand the constitutionally-defined jurisdiction of the Commission.[6] *1039 Appellant further argues that the 1994 constitutional amendment supports his interpretation of the legislature's lack of authority because the amendment would only have been necessary if NRS 1.440 were unconstitutional. We disagree.
The interpretation of Art. 6 section 21(9)(b) is a question of first impression for this court. Although the 1994 amendment thereto facially expands the scope of the Commission's powers to include municipal court judges and justices of the peace, in actuality, the amendment simply clarified the legislature's then existing authority to render these judicial officers subject to Commission discipline. Thus, the promulgation of NRS 1.440(1) by the 1977 Nevada legislature was within its constitutional prerogatives.
While article 6, section 21, in its original form, clearly and unambiguously vested the Commission with authority to discipline supreme court justices and district court judges, article 7, section 4 of the constitution gave the legislature the mandate to provide for the removal from office any civil officer other than those in "this article previously specified" for malfeasance or nonfeasance in the performance of official duties. This court has interpreted article 7, section 4 as authorizing the legislature to provide by statute for the removal of district, county and township officers. Robison v. District Court, 73 Nev. 169, 172, 313 P.2d 436, 438 (1957). In Gay v. District Court, 41 Nev. 330, 336, 171 P. 156, 157 (1918), this court relied upon section 4 of article 7 in upholding a statute giving district courts authority to remove certain public officers. Further, under this authority, the legislature had the option of setting removal guidelines. Thus, when article 6, section 21(9)(b) and article 7, section 4 are read together, it is apparent that the legislature was free to utilize the Commission as a medium for that purpose. Because the power of removal in this particular context also implies authority in the Commission to impose lesser sanctions, we hold that the Commission did have jurisdiction to either remove or impose any measure of discipline, including removal, in this matter. This is consistent with the opinion of the Attorney General's office that Nevada Constitution article 7, section 4 provided ample authority for the legislature to e Op.Nev.Att'y. Gen. No. 81-4, at 20 (March 3, 1981). The 1994 amendment to the Nevada constitution served the important purpose of clarifying the powers of the Commission as they existed as of the enactment of NRS 1.440.[7]
Appellant also contends that constitutional prohibitions against ex post facto application of laws prohibits the imposition of discipline for conduct predating the 1994 constitutional amendment. Because we hold that the Commission's power stems from the 1977 legislative enactment of NRS 1.440, we decline to reach this issue.[8]
Having concluded that there are no ex post facto issues to be resolved in this controversy, and having held that the 1977 enactment governs these proceedings, it follows that appellant may be disciplined under the specifications of charges unless the conduct in question has been rendered invulnerable to Commission review by prescription. The ARJD do not include a period of limitations within which a complaint must be filed with the Commission.
*1040 In contrast to Commission proceedings, "[f]ormal disciplinary proceedings shall not be commenced against an attorney for alleged misconduct occurring more than 4 years prior to the filing of the complaint by bar counsel." SCR 106. Appellant argues that "the failure to observe any reasonable limitation of actions violated his right to due process."[9] As sole authority for his premise, appellant cites Bowen v. New York, 476 U.S. 467, 481 n. 13, 106 S.Ct. 2022, 2030 n. 13, 90 L.Ed.2d 462 (1986), wherein the Supreme Court explained that statutory limitation periods are a recognition that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." Appellant further suggests that the two-year limit set forth in NRS 11.190(4)(b)[10] would be appropriate because judicial discipline is in essence a penalty or forfeiture.
The Commission disagrees, contending that: (1) NRS 11.190(4)(b) is wholly inapplicable because a disciplinary proceeding before the Commission is not the same as a civil cause of action upon a statute for a penalty or forfeiture; (2) there is no constitutional right to a "reasonable limitations period"; and (3) the judicial office is so important that all conduct while in office must be subject to scrutiny. Finally, the Commission notes that it took into consideration the remote occurrence of some of the alleged conduct and did not discipline appellant for charges based solely on distant conduct.
Appellant's reliance on Bowen is misplaced. Bowen is not directly on point; it does not stand for the proposition that due process requires a limitations period. Rather, courts have recognized that statutory limitation periods are measures of public policy entirely subject to the will of the legislature. See, e.g., State v. Nunn, 244 Kan. 207, 768 P.2d 268 (1989); State v. Hodgson, 108 Wash.2d 662, 740 P.2d 848 (1987), cert. denied, 485 U.S. 938, 108 S.Ct. 1117, 99 L.Ed.2d 277 (1988). Moreover, according to one treatise, most states do not have a limitations period that would proscribe the investigation of a judge's conduct occurring in the distant past. Judith Rosenbaum et al., Practices and Procedures of State Judicial Conduct Organizations ch. 2, at 15 (1991).
Although the doctrine of laches could be indiscriminately applied in the absence of an express limitations period, the Commission took an appropriately practical approach in considering the date of the alleged misconduct and whether appellant had cured the misconduct. The Commission did not consider remote acts unless they were a part of a recurring pattern of conduct. We are convinced that this approach addresses and resolves any fundamental due process concerns. We therefore conclude that the absence of a limitations period did not violate appellant's due process rights.

Fifth Amendment Concerns
At the formal hearing, the special prosecutor called appellant as a witness. After initially refusing to take the oath, appellant was sworn and then asserted a blanket Fifth Amendment privilege. Even after his attorney and the Commission directed him to answer the non-incriminating questions, appellant continued to refuse to answer most of the questions posed to him, including non-incriminating questions such as, "When were you first elected?"
The Commission made the following relevant finding of fact:
That [appellant], while testifying at the Formal Hearing on November 3, 1995, wrongfully asserted his Fifth Amendment right by refusing to answer simple, non-incriminating questions.... [Appellant's] behavior and attitude displayed when called to testify at the Formal Hearing was both contumacious and contemptuous.
Based on these facts, the Commission concluded that appellant's conduct violated ARJD 4, ARJD 11(3) and Canon 2(A). Additionally, the Commission dedicated almost two pages of its decision to a discussion of *1041 appellant's conduct at the formal hearing and concluded by stating that he should be removed from office. The final paragraph of the Commission's decision in the final report states:

The Commission emphasizes that in determining that the appropriate discipline for [appellant's] offenses is removal from office, it has not taken into consideration [appellant's] wrongful assertion of a blanket Fifth Amendment privilege. Since Rule 11 which establishes the grounds for discipline does not provide that a wrongful assertion of a blanket Fifth Amendment privilege is disciplinable conduct, the Commission would not discipline [appellant] for doing so without first giving him the opportunity to remedy that conduct. However, the Commission deems it appropriate to inform the judiciary that not only does a judge not have the right to assert a blanket Fifth Amendment privilege and refuse to cooperate with the Commission or testify when called as a witness before it, but that in the event a judge does so in the future, the Commission will deem such non-cooperation to be an act of misconduct, subjecting the judge to discipline. The Commission has taken into consideration the manner in which [Appellant] behaved in wrongfully asserting a blanket Fifth Amendment privilege, but not the fact that he wrongfully refused to testify in determining that removal is the appropriate discipline to be imposed.

(Emphasis added.)
Appellant impliedly argues that it was improper for the Commission to consider the manner in which he asserted his Fifth Amendment rights in determining the appropriate disciplinary action to take. Thus, appellant suggests that "the only issue on review is whether [APPELLANT] was required to humble himself before the Commission and whether his failure to do so should have been considered as a part of the ultimate decision."
The Commission concedes that appellant would have a Fifth Amendment right to refuse to testify on a question-by-question basis where he had a plausible claim of self-incrimination. The Commission further concedes that it would be inappropriate to consider the rightful invocation of Fifth Amendment rights, see Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), but that the Commission could, although it did not, consider the wrongful assertion of Fifth Amendment rights. See State v. Malone, 692 S.W.2d 888 (Tex.Ct.App.1985).
Having found in the context of the formal hearing that appellant wrongfully asserted his Fifth Amendment privileges, the Commission was entitled to consider that fact along with the severity of the offenses in determining the extent and type of appropriate discipline. Thus, the Commission was not restricted to a consideration of the "manner in which Judge Davis behaved in wrongfully asserting a blanket Fifth Amendment privilege." In this connection, we find that all of appellant's due process rights were protected by the Commission when it considered the issue and ultimately determined that the assertion of the privilege was wrongful.
Additionally, we conclude that the Commission rightfully considered appellant's demeanor at the hearing in the process of determining the appropriate sanctions to be imposed.
In this case, the Commission could have reasonably concluded that appellant's sophomoric and arrogant behavior was calculated to "poison the well" so that the fairness and validity of the Commission proceedings would be obscured on review. His contention on appeal that he is entitled to relief because he was required to "humble himself" is a clear sign that he had, to a degree, lost touch with a proper sense of his public trust and decorum. Certainly, he would never have tolerated such behavior in any proceeding over which he was charged with presiding. His approach to the hearing, whether or not a predetermined strategy, cannot be condoned. While we believe that his general behavior and the specific manner in which he invoked his Fifth Amendment privilege should have been disregarded in terms of whether imposition of discipline was justified on any specified charge, appellant's behavior was relevant, to a limited degree, to the *1042 deliberations over the nature of discipline imposed.

Commission Bias
Pursuant to ARJD 3(6), the respondent judge may challenge any member of the Commission for cause. The Commission must hear the challenge and
may disqualify any Commissioner who by reason of actual or implied bias would ... either be prevented from adjudicating the matter in a fair and impartial manner or, by reason of facts creating an appearance of impropriety, be prevented from adjudicating the matter in a manner consistent with maintenance of public confidence in the Commission.
Id. "A challenge for implied bias must be allowed on a showing of any of the grounds relating to jurors which are enumerated in NRS 16.050." ARJD 3(7).
Prior to the formal hearing, appellant filed a motion to disqualify Commission members Frank Brusa, Drennan A. Clark, Billy Gene Fuller, Michael R. Griffin, Alan J. Lefebvre and Sally Loehrer. The Commission denied the motion.
On appeal, appellant contends that because the Commissioners who sat at the preliminary hearing determined that perjury charges should be investigated and filed against him based upon his testimony at the preliminary hearing,[11] they "could not reasonably be perceived to be unbiased."
The Commission disagrees, arguing that in the absence of actual bias, there is nothing improper about combining investigatory, prosecutorial and adjudicatory powers in one body. The Commission cites Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), wherein the Supreme Court held that the combination of investigatory, prosecutorial and adjudicatory powers in a medical discipline panel did not violate the Administrative Procedure Act or due process of law. The Larkin Court explained:
Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against the judge's presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence.
Id. at 56, 95 S.Ct. at 1469.
However, in his reply brief, appellant's position was clarified as follows:
Contrary to the Commission's understanding of the argument, [APPELLANT] does not contend that the Commission was inevitably biased against him simply because it combines investigative, prosecutorial and adjudicative functions. Instead, it was the facts and circumstances of this particular case which realized the "potential for unfairness" identified by this Court in Rudin v. Nevada Real Estate Advisory Commission, 86 Nev. 562, 565, 471 P.2d 658, 660 (1970).
The Commission's conclusion that there was probable cause to believe appellant had committed perjury during the probable cause hearing does not necessarily demonstrate actual or implied bias on the part of the Commissioners who made the probable cause determination. *1043 Probable cause determinations are by no means a determination of guilt. Proof by clear and convincing evidence that appellant had committed perjury would still be required at the formal adjudicatory level. Thus, the fact that some of the Commissioners previously had found there was probable cause to believe appellant had committed perjury does not require that they be disqualified from participating in the formal hearing.

Whether findings were supported by clear and convincing evidence
Appellant argues that the Commission's factual findings were not supported by clear and convincing evidence and that he did not violate the Nevada Code of Judicial Conduct.[12]

Standard of Review
In reviewing the Commission's findings of fact, this court is confined to a determination of "whether the evidence in the record as a whole provides clear and convincing support for the Commission's findings." Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 267, 830 P.2d 107, 118 (1992); see ARJD 27. Moreover, "[t]he Commission's factual findings may not be disregarded on appeal merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact." Goldman, 108 Nev. at 267, 830 P.2d at 118. However, this court is not bound by the Commission's conclusions of law. Id. Thus we turn to an analysis of the charges at issue.

Count 1: Loans from employees
The Commission concluded that appellant's practice of borrowing money from court employees violated NCJC Canon 4(D)(1)(a) and constituted grounds for discipline under ARJD 11(3). On appeal, appellant contends that it was common practice within the North Las Vegas Municipal Court to loan money to coworkers, and that his conduct was not a violation of NCJC Canon 4(D)(1)(a)[13] because none of the employees testified that appellant exploited his position to obtain loans. Appellant also argues that the allegations are not grounds for discipline under ARJD 11(3) because his conduct was not in the "performance of judicial or administrative duties."
The Commission contends that the evidence clearly and convincingly demonstrates that appellant "was exploiting his position by requesting employees to loan him money." The Commission specifically points to Marilyn Bell's testimony that appellant was late in repaying a loan from her and that, after her husband threatened to involve the media, appellant repaid the loan with 2,500 one-dollar bills. We conclude that the evidence presented gives the Commission a substantial basis to find by clear and convincing evidence that Canon 4 D(1)(a) was violated by appellant using his position to secure substantial loans for lengthy periods of time without paying interest and refusing to repay the loan when requested.

Count 2: Political campaigning
The Commission found that appellant publicly endorsed and campaigned on behalf of Robert Archie, a candidate for justice of the peace of the North Las Vegas Township, in violation of NCJC Canon 5(A)(1)(b).
Our review of the record reveals that the evidence clearly and convincingly establishes that appellant publicly endorsed Archie for public office in violation of Canon 5(A)(1)(b). A videotape in evidence shows appellant approaching and knocking on the door of a house on Tonopah Street in North Las Vegas while wearing an Archie campaign shirt. The homeowner in question testified that she did not know appellant. Additionally, appellant was seen with a group of people going door-to-door and personally erecting campaign signs. Appellant explained, unconvincingly, *1044 that he merely walked his neighborhood with Archie, introducing Archie to people he knew. Clearly, he was doing more than just privately voicing his support for a candidate.
Pursuant to ARJD 11(3), grounds for discipline include "[a]ny acts or omissions in the performance of judicial or administrative duties which contravene express provisions of the [NCJC]." The NCJC proscribes conduct relating to both judicial activities and extra-judicial activities. Despite the ambiguity existing in ARJD 11(3) referring to "acts or omissions in the performance of judicial or administrative duties," we interpret the rule to include extra-judicial activities proscribed under the NCJC. We therefore conclude that appellant's campaign activities violated ARJD 11(3).

Count 3: Personal business in chambers
The Commission found that appellant used his chambers to conduct personal business by storing antiques in the courthouse, by selling those antiques to persons with whom he came in contact at the courthouse, and by using court employees to move antiques. The Commission concluded that this conduct violated NCJC Canons 2 and 4(D)(1)(a). Appellant contends that the record does not support the finding of a violation of the canons because there was insufficient evidence to establish a "business" (i.e., the testimony established four or five sales over 16 years), and there was no evidence demonstrating that he was perceived to be exploiting his judicial position.
Photographs admitted into evidence depict a vast "inventory" of antiques. Further, his testimony that he merely enjoyed having them displayed is virtually beyond belief. Although testimony established only a few sales to court employees and an attorney who saw one of appellant's pieces at an antique shop and discussed a purchase with appellant in chambers, we conclude that sufficient evidence was presented in support of this charge.

Count 6:[14]Incident at Friendly Ford

The Commission found that appellant took two uniformed marshals to Friendly Ford where he berated and intimidated an employee with a threat that the City of North Las Vegas would never purchase another vehicle from Friendly Ford because the court had not yet received ordered vehicles. The Commission concluded that this constituted a violation of NCJC Canon 2 and was grounds for discipline under ARJD 11(3).
Appellant argues that there was insufficient evidence to support the finding that he berated and intimidated the Friendly Ford employee. He also contends that his conduct was not a violation of Canon 2 because, as chief purchasing agent for his court, he did nothing other than express his dissatisfaction with the dealership's performance. Appellant thus insists that his conduct did not impugn public confidence in the "integrity and impartiality of the judiciary."
Georgia Nunez testified that it was her perception that appellant berated and intimidated the dealership's employee and that after the incident appellant had said that he probably overreacted. The commentary to NCJC Canon 2 states, "Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges.... A judge must expect to be the subject of constant public scrutiny." Additionally, the commentary explains that "[t]he test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired."[15] However, keeping in mind the trust of ARJD 11(3) that the NCJC is to be read strictly in favor of the judicial officer, and the preamble to the NCJC providing that not all violations of the *1045 code warrant discipline, we conclude that appellant's ill-advised conduct does not constitute a sufficiently serious violation of NCJC Canon 2 to warrant discipline.

Count 7: Using court employees for personal business
The Commission found that appellant used court employees to drive him to work, to perform translating services at his mother's nursery business, and to accompany him while he looked for antiques. The Commission concluded that this conduct violated NCJC Canons 2, 2(A), 4(A)(2), and 4(A)(3).
Appellant contends that the alleged conduct should not be construed as a violation of NCJC Canon 2(A), i.e., that the conduct demeaned the judicial office or interfered with the proper performance of judicial duties. He points to the following testimony as support. Don Cola, an employee of the court, testified that over a year and a half before the hearing, appellant stopped taking him to look at antiques. Linda Stiles testified that she only ran errands for the judge on her own time.[16] Yolanda Roybal testified that she went to the nursery to interpret for a Spanish-speaking employee once in the early 1980's as a favor to appellant, and that it could have been on her lunch break, although she could not remember. Georgia Nunez testified that she translated at the nursery three or four times in 16 years. Marshal Kevin Nitzschke testified that he drove the judge to work for security reasons.
Although some of the testimony indicated that personal errands were undertaken during lunch breaks, there was also competent testimony that the excursions relating to antiques would last up to two hours several times a week. Accordingly, we conclude that clear and convincing evidence established that this conduct constituted a violation of NCJC Canon 4(A)(3). However, we are not persuaded that these activities constituted a violation of NCJC Canons 2(A) and 4(A)(2). Such conduct does not clearly demonstrate that appellant did not respect or comply with the law or that this behavior demeaned the judicial office.

Count 8: Contributions in lieu of fines
The Commission found that appellant suggested that criminal defendants contribute money to charities on a list he had prepared in lieu of paying fines to the City of North Las Vegas and that he did so, in part, to enhance his electability. The Commission concluded that this conduct violated NCJC Canons 1, 2, 2(A), and 4(C)(3)(b)(i) & (iv), and constituted grounds for discipline under ARJD 11(3).
Appellant contends that no evidence was presented in support of the finding that he used this practice to enhance his electability. He further argues that he did not believe it was a violation of Canon 4(C)(3) because the defendants had a choice as to whether to contribute and which charity would receive the contribution. Finally, appellant points out that he discontinued the practice after he was informed that an opinion of the Attorney General stated that it was unethical and that the Nevada Supreme Court did not approve of the procedure.
We conclude that appellant's conduct violated NCJC Canon 4(C)(3). "The rule addresses the dual fears that potential donors either may be intimidated into making contributions when solicited by a judge, or that they may expect contributions when solicited by a judge, or that they may expect future favors in return for their largesse." Jeffrey M. Shaman et al., Judicial Conduct and Ethics § 9.06, at 289 (2d ed. 1995). This treatise also directs our attention to unreported decisions wherein judges were disciplined for conduct similar to that presently under scrutiny. In one case, the judge disposed of cases by requiring the defendant to contribute stated amounts to charities named by the judge. In another, the judge allowed defendants to make voluntary contributions to law enforcement services in exchange for dismissal of traffic infractions. Id. at 290 nn. 40-41. Accordingly, we conclude that appellant violated NCJC Canon 4(C)(3). Further, *1046 this conduct violated the other canons identified by the Commission.

Count 10: Zoning violation and trespassing
The Commission found that appellant willfully and knowingly used property which he partly owned for commercial purposes when said property was zoned for residential use, and that he caused his agent (a subcontractor) to trespass on adjoining property to hook up water and sewer lines.
The Commission also found that appellant testified falsely during the probable cause hearing as to who owned the trees stored at the property in question. The Commission concluded that appellant's conduct violated NCJC Canons 1, 2, and 2(A) and constituted grounds for discipline under ARJD 11(2) and 11(3). Appellant contends that there was no evidence that the trees stored on the property belonged to him and that he never intended to use the property as a commercial growing yard. Appellant also insists that he did not instruct his subcontractor in any way regarding the water and sewer hookup and assumed that all permits had been obtained by the subcontractor. Finally, he maintains that his conduct did not violate the canons and that he did not trespass on the adjoining property.
The evidence adduced on this charge is somewhat equivocal. The Davis Family Trust purchased a parcel of real property located at West Craig Road in North Las Vegas in which appellant and his mother each owned a one-half interest. The property is zoned for residential use only. Appellant's brother, Don Davis, testified that the property was purchased in the hope that it would later be zoned commercial and could then be resold.[17]
According to Don Davis, he offered to purchase property in Moapa in May of 1993, which he wanted to use as a growing yard; however, the purchase did not close until February 1995. As part of a joint venture, his mother purchased trees in November 1993, which Don Davis hoped to grow on the Moapa property. The trees were delivered to the Craig Road property in the spring of 1994 because the Moapa property had not closed and was not ready to receive the trees.
In response to an inquiry by appellant, Don Brown, the developing director for the City of North Las Vegas, notified appellant in July 1993 that the Craig Road property was zoned residential and opined that the property would not be eligible for rezoning. Thereafter, Brown received a complaint from Harry Segal, an adjoining landowner (a developer), that the Craig Road property was being used as a nursery. Brown investigated and concluded that the allegations were unfounded. Nevertheless, Brown continued to drive by the property periodically and eventually began to suspect that the property was being used for purposes other than residential use. In December 1993, Brown informed appellant that a complaint had been filed. Appellant complied with a settlement agreement with Chief Deputy City Attorney Mark Zaloras for the removal of the trees (approximately 1,100)[18] over a period of time. Zaloras testified that there was nothing unusual about the case and that he did not perceive that appellant tried to use his status as municipal court judge in the jurisdiction where Zaloras practiced. The Commission found appellant's conduct with regard to the zoning violation and two-year delay[19] in removing the trees to be particularly egregious because he was violating the very ordinances which he was charged with enforcing.
As to the trespass, Don Davis testified that he never gave his contractor permission to connect a sewer line or to break through a wall on his property to do so. The Engineering Projects Coordinator for the City of North Las Vegas testified that when she pulled the permit she was not aware that *1047 appellant was involved and that she mistakenly indicated on the permit that it was pulled for Segal's development. She also testified that she did not think a private right-of-way would have been necessary. Mr. Segal testified that sometime after the Craig Road property was being investigated based upon Segal's complaint, appellant approached him, asked him to support rezoning the Craig Road property, and then asked for a $5,000 campaign contribution.[20] Appellant allegedly told Segal that he was going to make the property a nursery and said, "I can do everything in Las Vegas. Las Vegas is in my small pocket. I can do whatever I wish." He also threatened to put pigs and chickens on his property if Segal did not support the rezoning effort.
We conclude that the evidence regarding the trespass is inconclusive. However, the Commission obviously believed the testimony of Segal and his account of the events and statements by Davis; and this establishes that appellant abused and impugned his judicial office. With respect to the zoning issue, clear and convincing evidence establishes that appellant violated NCJC Canons 1 and 2(A) by failing to comply with the law even after he had been advised of the zoning violations. Despite any problems with his brother's Moapa property, appellant should not have allowed the zoning violation to occur in the first place. Thus, his conduct does tend to implicate the integrity of the judiciary. We therefore conclude that the Commission's findings and conclusions with respect to the zoning violation are supported by clear and convincing evidence and that the conduct warranted discipline.

Appropriate sanctions
As the Goldman court recognized, the Nevada Constitution expressly authorizes this court to reverse the sanction imposed by the Commission or "take any alternative action provided in this subsection." Goldman, 108 Nev. at 267, 830 P.2d at 118 (quoting Nev. Const. art. 6, § 21(1)). "Thus, on appeal, we are specifically enjoined by the constitution to exercise our independent judgment regarding the appropriate sanction warranted by factual findings properly adduced by the Commission." Id. at 268, 830 P.2d at 118.
Appellant argues that the discipline imposed, removal from office, was excessive. He suggests that removal was excessive because none of the alleged conduct evidenced that he misused his office for his own personal gain or profit or that he ignored the rights of litigants appearing before him. He concludes that the alleged conduct "represent[s] human failings without any intention of purposeful misconduct which would justify imposition" of such severe sanctions.
The Commission responds that it had no other choice than to order appellant's removal from office because the evidence established that he treated his office "as a personal fiefdom." According to the Commission, the videotape of appellant's appearance at the formal hearing is the best evidence of "the contempt with which he treated his public trust."
The record supports the Commission's interpretation. Thus, while many of the charges would not sustain removal standing alone, the totality of the sustained charges, appellant's wrongful assertion of privilege and his contumacious demeanor at the hearing demonstrated that the totality of the offenses, sustained by clear and convincing evidence, justified appellant's removal from office.
The dissent asserts that "possible abuses of the appellate process have occurred, but its claim is supported only by speculation." This case was processed by following normal procedures of this court and was unusual only in that one retiring justice was replaced by his successor. What is unusual is that now Justice Springer improperly discloses what he remembers to be the vote taken in this case immediately after argument and a draft opinion prepared by one justice. Disclosing this information breaks a long-standing rule of court confidentiality in the decision-making process. This court recognized that rule when a majority of the court, including Justice Springer, admonished a fellow *1048 justice for disclosing that staff had prepared the conclusion in an opinion. State of Nevada v. District Court, 108 Nev. 1030, 842 P.2d 733 (1992) (disclosing that the dissent's statement that staff reached the conclusion in an opinion revealed confidential court information and breached long accepted standards of collegiality). Here, Justice Springer is not only disclosing a preliminary draft but also portions of the initial deliberations in an inaccurate manner.
Justice Springer's claim that he has some sort of duty to disclose the confidential processing of this case also misses the mark. He argues that in fairness to Davis, it is necessary to show that Davis would have won this appeal if it was decided immediately after oral argument when a preliminary vote was taken. Besides the fact that this is not how this court operates, preliminary votes are tentative and often subject to further review of applicable law and the facts of the case. Justices often change their initial vote after further consideration. Justice Springer concedes as much. There is absolutely no valid reason to disclose the internal processing of Davis' appeal. Nothing improper happened in deciding this case, and Justice Springer discredits himself and this court to so suggest.
The dissent also suggests that the Commission selectively prosecuted Judge Davis and that judges who the Commission brings to a full public hearing might become "victims of irrational and discriminatory Commission excesses." It cites a number of complaints made to the Commission that were not pursued to a final hearing. Without knowing the facts and documents available to the Commission, it is impossible to determine the validity of the Commission's action, and this criticism is simply a regurgitation of Justice Springer's prior criticism of the Commission. See Whitehead v. Comm'n on Jud. Discipline, 111 Nev. 1459, 1467-69, 908 P.2d 219, 222-23 (1995). Suffice it to say, we are aware of no selective prosecution of former Judge Davis, and there was ample evidence to show that he repeatedly abused his position as a municipal court judge and used it for his own personal benefit.

CONCLUSION
We conclude that the Commission had jurisdiction to consider appellant's pre-1994 conduct; that there is no due process right to a period of limitations within which a judicial discipline complaint must be filed; and that the Commission properly considered the fact of and the manner in which appellant asserted his Fifth Amendment rights when considering appropriate disciplinary measures.[21]
SHEARING, C.J., and YOUNG, J., concur.
SPRINGER, J., dissents.
APPENDIX

1. Grounds for discipline

The grounds for discipline are set forth in ARJD 11. In this case, the Commission relied upon two of the five grounds listed:
....
2. Any acts or omissions amounting to any public offense which tend to corrupt or to impair the administration of justice in any court.[22]
3. Any acts or omissions in the performance of judicial or administrative duties which contravene express provisions of the Nevada Code of Judicial Conduct. When applied for purposes of determining whether misconduct has occurred, the provisions of the Nevada Code of Judicial Conduct must, considered as penalty provisions, be strictly construed in favor of the respondent judge.
....

2. NCJC Canons found to have been violated

Canon 1 provides:
A judge shall uphold the integrity and independence of the judiciary.

Canon 2 provides:

*1049 A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities.

Canon 2(A) provides:
A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Canon 4(A) provides, in relevant part:
A judge shall conduct all of the judge's extra-judicial activities so that they do not ... (2) demean the judicial office; or (3) interfere with the proper performance of judicial duties.

Canon 4(C)(3)(b) provides, in relevant part:
A judge ... shall not personally participate in the solicitation of funds, or other fund-raising activities ... [and] shall not use or permit the use of the prestige of judicial office for fund-raising or membership solicitation.

Canon 4(D)(1)(a) provides in relevant part:
A judge shall not engage in financial and business dealings that:
(a) may reasonably be perceived to exploit the judge's judicial position, or....

Canon 5A(1)(b) provides in relevant part:
Except as authorized in Sections 5B(2) and 5C(1) a judge or a candidate for election or appointment to judicial office shall not:
....
(b) publicly endorse or publicly oppose another candidate for public office.
SPRINGER, Justice, dissenting:
I dissent from this court's order affirming the removal of Judge Davis from his judicial office. Although I have several grounds for dissenting, I dissent principally because the Nevada Commission on Judicial Discipline has exceeded its constitutional jurisdiction in ordering removal. I am in complete agreement with Commissioner Griffin, who "disagree[d] that removal is warranted" and voted that, instead of being removed from office, Judge Davis should be "issued a censure, be required to attend courses in ethics and be fined."
The several reasons for my dissent are as follows:
1. Constitutional Invalidity of the Removal Order. Article 6, section 21(6) of the Nevada Constitution provides that no judge may be removed "except for willful misconduct, willful or persistent failure to perform the duties of his office or habitual intemperance." The complaint does not charge Judge Davis with any conduct that would subject him to removal under the Nevada Constitution. The Commission made no findings or conclusions relative to the required willful misconduct, persistent failure to perform judicial duties or habitual intemperance; and, as a consequence, the Commission is without the constitutional power to remove Judge Davis.
2. Manifest Excessiveness of Penalty. Commissioner Griffin recognized what the other Commissioners apparently did not, namely, that the charges in this case range from minor (borrowing money from court staff members) to trivial (playing "inappropriate songs" such as "Jail House Rock" in his chambers). The Commission itself declined to "discipline the respondent for [certain charged acts] without first giving him the opportunity to remedy that conduct." I served on the Commission for a ten-year period and believe that I can take notice of the fact that minor derelictions of the kind involved here are properly and customarily dealt with by advising the erring judge to discontinue the conduct and "giving [the judge] an opportunity to remedy that conduct." That Judge Davis would be permanently removed from office (even if it were Constitutionally permissible for the Commission to do so) without being afforded an opportunity to change objectionable behavior is unthinkable under the circumstances of this case.
3. Selective Prosecution. Judge Davis has, unlike other judges who have been charged with relatively minor infractions of the Code of Judicial Conduct, been subject to the most severe penalty allowable. From this and other aspects of the prosecution of Judge Davis, I conclude that he has been the *1050 victim of selective, prejudicial prosecution. In the many cases of minor derelictions and minor deviations from proper judicial conduct that I have witnessed during my service as a judicial discipline commissioner, the kinds of misbehavior charged here would, unexceptionably, be handled by warning or, at most, by private reprimand. The rational, unpolitical way of handling this case would have been to go to Judge Davis and tell him that there had been reports of unacceptable conduct which, if true, must be remedied immediately. It has been my experience that such a warning works in almost every case. If formal proceedings were thought to be unavoidable under the circumstances of this case, it still seems clear to me that this is not the kind of case that even comes close to providing cause for permanent removal from the bench; and I cannot conceive of removal being ordered in this case absent the interjection of political motivations or other unwarranted, prejudicial considerations.
I find in this record no indication that Judge Davis had been guilty of recurrent misconduct or of previous commission of the kinds of delicts that resulted in removal proceedings in this case. As stated above, I find nothing that would make me think that this case could not have been expeditiously resolved simply by saying something to Judge Davis like this: "Judge Davis, it has come to our attention that you have been engaging in some kinds of conduct that are not fitting for a judgeplease discontinue these practices, or you are going to be subject to formal disciplinary proceedings." There is only one thing in this entire record that gives even a hint as to why or how these relatively trivial charges were so magnified and ended up in Judge Davis' being permanently removed from office, and that is that he "flunked the attitude test," that he made the Commission members so angry with him that they decided to "throw the book" at him. It is quite apparent that Judge Davis believed that he was the object of a witch hunt. This made him resentful and did reflect in his attitude toward the Commission. Judge Davis was successful in making all of the members of the Commission mad at him; but, obviously, this does not provide grounds for the ultimate judicial discipline, removal from office. It is very much to the credit of Commissioner Griffin (who, as I read the record, was also angry at Judge Davis) that he was able to set aside this anger and arrive at what is arguably a fair result in this caseadmonish, perhaps discipline, but not remove Judge Davis from office.
Aside from my personal experience, I do not think that many persons who are familiar with the judicial discipline process would come to a conclusion different from mine or would think that a judge should be removed from office except, of course, in cases of very serious misconduct, until she or he had an ample opportunity to correct objectionable judicial behavior. Clearly, where the misconduct persists, formal proceedings may become necessary, but, under the rules in effect during these proceedings, it is only in cases where there is willful misconduct or willful or persistent failure to perform judicial duties that removal is warranted. As pointed out in this dissent, there is no willful or persistent misconduct involved here.
Judge Davis has been singled out for special, uncalled-for draconian punishment. There are two aspects to this discriminationone is that judges charged with similar conduct have been unexceptionably treated with sympathy and understanding rather than removal from office; the other is that in the past judges who appeared to have been involved in much more serious judicial misconduct than what was charged against Judge Davis have not only escaped removal from office but have escaped the judicial disciplinary process entirely.
With respect, first, to the Commission's historically sympathetic approach toward judges who face charges more serious than those levied against Judge Davis, I point to the case of "Judge D" (a fictitious designation), referred to throughout the Whitehead case. See, e.g., Whitehead v. Comm'n on Jud. Discipline, 111 Nev. 70, 893 P.2d 866 (1995) ("Whitehead II"); Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 380, 873 P.2d 946 (1994) ("Whitehead I"). The Judge D case began when a judge filed a formal complaint against a fellow judge, stating many instances of serious judicial misconduct. *1051 "[A]fter receiving a sworn complaint against Judge D, the Attorney General investigated the matter and obtained numerous (reportedly approximately thirty to forty) written, signed statements of the [complaining] witnesses." Whitehead II, 111 Nev. at 134, 893 P.2d at 905.
The gist of the complaint against Judge D was, according to a Commission newsletter, multiple "angry outbursts ... from the bench and in chambers directed toward citizens, attorneys and court personnel." This was the second such series of complaints that was filed against this judge; and it is very difficult to argue that these offenses, although not calling for removal from office, were not considerably more serious than those brought against Judge Davis.
Rather than proceeding to a probable cause hearing and making public the charges against Judge D, the Commission decided to hold secret hearings in which it was able to convince Judge D to "consent" to certain terms of "voluntary" discipline to be imposed by the Commission.
Among other things, the terms of discipline that the Commission imposed upon Judge "D___," after the extended, pre-probable cause, secret proceedings conducted by the Commission and the prosecutors, included the requirement that the judge undergo "psychological evaluations" and the requirement that the judge submit to "ongoing counseling for anger-management" with the daughter of one of the Commissioners. (The minutes quite surprisingly reflect that "the Commission found no conflict" arising out of its order compelling Judge "D___" to counsel with the Commission member's daughter. The record does not reveal the sums of money that Judge "D___" expended for the professional services rendered either by the Commissioner's daughter or other professional counsellors which the judge was required to consult; we know only that the judge was specifically directed to continue anger-counseling with the daughter for a period of eight months.)
Whitehead I, 110 Nev. at 419, 873 P.2d at 970.
In addition to "anger counseling," Judge D agreed to be placed "on probation" to the Attorney General for eighteen to twenty-four months and to submit to a public censure, all of which constituted a disciplinary disposition very much like that proposed in this case by dissenting Commissioner Griffin.
Given the fact that Judge Davis was not given the favor of having the kind of secret session with the Commission afforded to Judge D, and given the failure of the Commission to give Judge Davis an opportunity to correct any misbehavior that might have been found by the Commission, it seems very clear to me that the prosecution of Judge Davis was selective and discriminatoryto such a degree that fairness demands a remand of the entire matter to the Commission so that Judge Davis can be given the same sort of kindly consideration that was given to Judge D.[1]
As to the other mentioned aspect of discriminatory treatment at the hands of the Commission, the failure of the Commission to discipline judges who are involved in truly serious judicial misbehavior, I make reference to a "Table of Disciplinary Oversights," which I filed with the court on October 28, 1994. Accompanying that document I filed a statement declaring:
My examination of the secret Commission records ... has led me to the conclusion that our system of judicial discipline has broken down and has shown itself in recent times to have been incapable of carrying out its intended constitutional functions. The ineffectiveness of the judicial discipline process is particularly evident and destructive in the area of unethical campaign practices in judicial elections.
In the "Table of Disciplinary Oversights" I sampled some twelve instances of charges of serious judicial misconduct which not only were not the subject of removal proceedings but which, in most cases, resulted in no disciplinary action being taken at all. To cite *1052 just a few of the examples of unpunished misconduct, I would mention the following:
a. A judge was charged, under oath by another judge, (1) with racism (holding an hispanic gentleman in contempt of court and telling him he could "go to jail until he learned English"), (2) with a "pattern of discrimination against women, Spanish-speaking persons and Native Americans," (3) with physically assaulting and battering a female news reporter, (4) with unlawfully altering court records, and (5) with leaving the bench in a criminal case, telling the attorney to go ahead and present the evidence in his absence. The complaint against this judge was dismissed by the Commission, and the judge was not removed from office or otherwise disciplined in any way.
b. A sworn complaint was filed by one judge against another judge charging that during a political campaign the accused judge issued a number of false and slanderous statements about his opponent, portraying his opponent in paid political cartoons as an "animal" and a "monster," and, among other things, falsely imputing to his opponent racist and other biases that had no basis in fact. This complaint received no hearing by the Commission and was dismissed without any consideration of the charged misconduct.
c. A sworn complaint was filed by one judge against another charging unethical and slanderous campaign practices in the form of depicting the complaining judge in judicial robes receiving cash money under the table. That the complaining judge was not in criminal receipt of money or other bribes was well known to the judge being charged with misconduct; yet the charged judge willfully published the false and defamatory political advertisements. This complaint, like the preceding complaint, was dismissed by the Commission, and no disciplinary action of any kind was taken against the charged judge.
d. A sworn complaint was filed against a jurist for violating Canon 2B of the Code of Judicial Conduct ("A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others...."). The complaint charged that the jurist went to a prosecuting official on behalf of a friend and business associate and told that official that he would love to see the prosecution "go away." If these allegations were true, they call for removal from office.[2] The complainant was not permitted a hearing and the complaint was dismissed by the Commission without further proceedings.
e. A judge was convicted of drunken driving but no judicial discipline was ever imposed by the Commission.
I think it is fair to conclude that Judge Davis' case is an exception to the general rule. The rule is this: in relatively minor cases, judges are given an opportunity to amend their deportment and are not removed from office; and in cases of very serious acts of judicial misconduct, the acts of misconduct are ignored entirely. The discriminatory treatment of Judge Davis, of itself, warrants reversal of the Commission's removal order.[3]
4. Due Process Violation. If I exclude unsavory political motivations as a possible explanation of the discriminatory treatment given to Judge Davis, the only thing that can *1053 explain why the Commission took such extreme action in his case is that Judge Davis made the Commission angry when he asserted his Fifth Amendment Privilege. One reason that I think this is the case is because the Commission, protesting too much, denies that it was influenced by Judge Davis's assertion of the privilege. ("The Commission emphasizes that in determining that the appropriate discipline for Judge Davis' offenses is removal from office, it has not taken into consideration Judge Davis' wrongful assertion of a blanket Fifth Amendment privilege.") In reviewing this record, it is obvious that Judge Davis' assertion of his privilege is the only plausible and available explanation for such an extreme reaction by the Commission. There is no other explanation for its taking such an excessive position.
The manner in which the Commission dealt with Judge Davis' assertion of Constitutional privilege was to cite Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline ("ARJD") 4, which requires judges to "cooperate with the commission when called upon to assist in any investigation or hearing or to testify concerning any matter." Obviously, ARJD 4 does not require a judge to "cooperate with the commission" or to testify in a case in which the judge himself or herself is the defendant. The Commission even went so far as to take the position that a respondent/defendant judge may not "refuse to cooperate with the Commission or testify when called as a witness before it" and went on to proclaim that if an accused judge refuses to cooperate, "the Commission will deem such non-cooperation to be an act of misconduct, subjecting the judge to discipline." Put another way: Judges who are formally charged with misconduct are obliged to cooperate with their accusers and to testify if called as a witness; if they do not, this "refusal to cooperate" will be, in itself, "an act of misconduct." Can the Commission be serious when it makes such outlandish pronouncements?
It is apparent to me that Judge Davis' invocation of the Fifth Amendment so infuriated the Commission that its members (Commissioner Griffin dissenting) decided to impose the capital punishment of judicial discipline, removal from office. Whether or not Judge Davis had the right to refuse to testify at all (as would be his right had he been a criminal defendant) is a matter of no little difficulty and complexity. I would note that ARJD 11(3) provides that "in determining whether misconduct has occurred" the provisions of the Code of Judicial Conduct "must be considered as penalty provisions," in other words, penal in nature. (Emphasis added.) One would think then that a respondent in judicial discipline proceedings would have the same rights as a criminal defendant to assert the privilege against self-incrimination and not be forced to be stultified by being required to answer such questions as "What is your name" and "When were you elected," when the answers to such questions are already well known to the accusers.
Although I am convinced that Judge Davis had every right to refuse to testify, I stress the point that there was, and has been, no judicial ruling on that point in this state and that the Commission was clearly out of line when it ruled that "Judge Davis wrongfully refused to testify" and that Judge Davis "violated Rule 4 of the Administrative and Procedural Rules."
As put in its Decision in this case, the "Commission has taken into consideration the manner in which Judge Davis behaved in wrongfully asserting a blanket Fifth Amendment privilege...." The Commission had no right to conclude that Judge Davis "wrongfully" asserted his constitutional privilege and certainly had no right to remove him from office for asserting his rights under the state and federal Constitutions. That the Commission would remove Judge Davis from office because he "refused to cooperate" has a dire ring to it; and I believe the majority to be very wrong in permitting the Commission to get away with this kind of pernicious nonsense.
About the only remedy available to judges who might become victims of irrational and discriminatory Commission excesses is the state supreme court. Unfortunately, as further evidenced by this decision, that institution is in a state of serious disarray, and it is sadly apparent that there is no remedy for *1054 judges who are mistreated by the Commission on Judicial Discipline.
5. Possible Abuses of the Appellate Process. The question that I raise at this point relates to the fact that in October 1997, Judge Davis had, by majority vote, "won" his case before this court, and, in October 1997, Judge Davis, by majority vote, lost his case before the court.
The more direct question is whether delay was used as a device to maneuver the result in this case from a reversal of the Commission's decision to an affirmance.
Although, of course, I have my own opinion concerning the question at hand, I make no judgment on the matter and raise the question, as I do, because I believe that Judge Davis has the right to know about these matters in order that he can be placed in a position to make further inquiry or to pursue a review of the matter in another forum, should he choose to do so.
At a minimum, I believe that Judge Davis is entitled to know the following:
Judge Davis' case was decided[4] in his favor in September 1995, and re-decided, this time not in his favor, in September 1997. On September 10, 1995, a majority of the court voted to reverse the decision of the Commission, and, specifically, "to impose a lesser measure of discipline, mindful of the sanctions he has already experienced" and to "reinstate Judge Davis to his judicial office as a municipal court judge." After the case was so decided, one of the justices held up the signing of the majority opinion for the expressed purpose of writing a dissent. No dissent was forthcoming, and at some time not known to me, but after Justice Steffen retired from the court in 1996, the minority, dissenting judge was able, in the absence of Justice Steffen, to secure a majority of the court to vote with the then dissenting justice to rule against Judge Davis and in favor of the Discipline Commission.
I know of only one previous instance in which a justice of this court wrote publicly about the ordinarily confidential internal workings of the court as I now do in this dissenting opinion. Although there are no formal rules on the subject, there are certain "traditions and norms of the appellate process," which have, almost without exception, been honored by this court. State of Nevada v. District Court, 108 Nev. 1030, 842 P.2d 733 (1992). The only time in the history of this court that there has been a recorded departure from these customary traditions and norms of the appellate process is in the cited State v. District Court case (to be cited as "State"). In State, Justice Young was, as stated in the majority opinion, "admonished" by the court for engaging in a "most disturbing ... breach of long-established standard of collegiality in appellate courts," 108 Nev. at 1034, 842 P.2d at 736. The court ruled in State that Justice Young's disclosures (disclosing theretofore inviolate confidential inner workings of the court) "reveal[ed] a total lack of appreciation of the traditions and norms of the appellate process."
In State, this court severely chastised Justice Young for his insensitivity and lack of appreciation of court traditions and norms and admonished him for his "misleading characterization of the decision-making process of this court." This court declared in its opinion censuring Justice Young that the court was "dismayed that Justice Young, who relies so heavily on his staff for production of his opinions," would act in a manner that was so "contrary to established court protocol."
I maintain that present disclosures to Judge Davis relating to the manner in which his case was treated are entirely different from the unwarranted disclosures that brought about the censuring of Justice *1055 Young in State. I would not do what I am doing if I thought that I was being, like Justice Young, guilty of a "breach of long-accepted standards of collegiality in appellate courts." In my view the circumstances in the present case can be distinguished from those in State, in which Justice Young was merely peevishly charging that the court's staff decided the case rather than the court and that the court's staff "reached the conclusion" upon which the case ruling was based. Justice Young's intemperate and false charges were based on nothing other than his angered dissatisfaction with the majority opinion and not upon the kind of "duty to disclose" that I believe to be present in this case.
This is not the first time that appellate jurists have been called upon to disclose certain ordinarily-confidential proceedings in the appellate process.[5] Whereas there was no apparent justification for Justice Young's indiscretion in State, it appears to me that in this case it is imperative that Judge Davis be made aware of these matters. Judge Davis may or may not be able to construct a provable claim arising out of possible internal decision-making irregularities in the decision of his case; nonetheless, he is entitled to know what has been presented in this dissenting opinion.
I express no judgment on the chronology which I have outlined above, but the circumstances surrounding the decision-making process certainly lead to some possibly troubling inferences[6]; and it appears to me that Judge Davis has the right to pursue a claim that the case was held up until Justice Steffen retired and that there are unacceptable political overtones to this case that should be explored before the matter is finally put to rest.
6. Conclusion. There has been a great miscarriage of justice here; it is indeed unfortunate that the majority vote of September 1995 in Judge Davis' favor does not represent the final decision of this court.
NOTES
[1] The complaints were filed by Georgia Nunez and Marilyn Bell. Nunez had been working at the municipal court as a clerk when appellant first took office. Over time, appellant promoted Nunez until she became the court administrator in 1988; however, on October 7, 1993, appellant fired Nunez. Marilyn Bell had worked in various positions, including court clerk, at the municipal court. She began working there before appellant took office, and she retired on January 31, 1995. Bell and Nunez were close friends. Nunez also has a civil suit pending against appellant and the City of North Las Vegas.
[2] The Commission hired Frank J. Cremen to act as the special prosecutor; he filed the formal statement of charges as a public document, as required by the Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline ("ARJD") Rule 16. At that point, as specified by the rule, all confidentiality ceased.
[3] Appellant asserted a blanket Fifth Amendment right to refuse to answer virtually all questions addressed to him by the Commission. Given the extent to which appellant withheld his cooperation in the hearing, it is readily understood why his actions were viewed as being disdainful of the Commission.
[4] Testimony before both Judiciary Committees of the Assembly and Senate in support of the legislation indicated the intent was to bring the courts of limited jurisdiction under the Commission's jurisdiction as a step toward a uniform court system. See Assembly Judiciary Committee Minutes on S.B. 453, 59th Legislative Session, at 3 (April 20, 1977) (testimony of Judge Richard Minor, justice of the peace and president of the Nevada Judges Association); Senate Judicial Committee Minutes on S.B. 453, 59th Legislative Session, at 797 (April 12, 1977) (same).
[5] Pursuant to section 1 of article 6 of the Nevada Constitution, "[t]he Legislature may also establish, as part of the system, Courts for municipal purposes only in incorporated cities and towns."
[6] Appellant also argues that reading subparagraph 9(d) to allow the legislature to expand the Commission's jurisdiction would be a delegation of power in violation of the separation of powers doctrine. Appellant cites City of North Las Vegas v. Daines, 92 Nev. 292, 550 P.2d 399 (1976), and Dunphy v. Sheehan, 92 Nev. 259, 549 P.2d 332 (1976), in support of his position. Both cases provide general statements about the separation of powers doctrine; however, neither case is particularly assistful in this analysis. In Daines, this court held that a municipal judge possessed the inherent power to dismiss the municipal court administrator. In Dunphy, this court noted, out of deference to the doctrine, that the legislature excluded members of the judiciary from the Ethics in Government Law. We conclude that appellant's separation of powers argument is meritless.
[7] Even though the ballot question explanation stated the purpose of the amendment was designed to add justices of the peace and municipal judges to the ambit of Commission authority, the explanation does not have the force of law.
[8] We would note that the prohibitions against ex post facto laws generally are not implicated by non-criminal proceedings such as these.
[9] Pursuant to ARJD 26, "the respondent [judge] must be accorded due process of law."
[10] NRS 11.190(4)(b) imposes a two-year statute of limitations for "[a]n action upon a statute for a penalty or forfeiture, where the action is given to a person or the state, or both, except when the statute imposing it prescribes a different limitation."
[11] On October 2, 1995, two months after appellant testified at the preliminary hearing, the special prosecutor filed a motion to amend the findings of probable cause to add an additional count accusing appellant of perjury when he "offered testimony concerning the circumstances of his repayment of the loan to Marilyn Bell." On October 24, 1995, the Commission issued an order finding that the evidence presented at the August 2, 1995 hearing established "a reasonable probability that the evidence available for introduction at a later formal hearing could clearly and convincingly establish grounds for disciplinary action for willfully giving false testimony under oath at [the preliminary hearing]."

Additionally, the Commission ordered the special prosecutor to file a formal complaint charging appellant with perjury. After the Commission rendered its judgment on the first formal complaint and ordered appellant's removal from office, it determined that the perjury complaint had been rendered moot. The Commission dismissed that complaint without prejudice. Thus, the Commission is free to proceed with that charge.
[12] The particular Canons of the NCJC which the Commission found to have been violated by appellant, and the provisions of the ARJD used as grounds for discipline, are reproduced in an appendix to this opinion.
[13] Appellant also argues that his conduct was not a violation of NCJC Canon 4(D)(b). Although the formal complaint alleged that the loans violated this canon, the Commission did not so find.
[14] The Commission concluded that there was no violation as to Count 4 because Judge Davis had corrected his conduct in a timely fashion. The Commission also concluded that Count 5 demonstrated poor judgment but was not a violation of the NCJC.
[15] We recognize that the presence of the two uniformed marshals and appellant's threats probably had a significant influence on the employee. We also recognize that appellant does not appear to recognize the significance of this type of behavior.
[16] Ms. Stiles actually stated that it was during work hours, but on her personal breaks or lunch hour.
[17] An application filed with the Department of Business Industry's Division of Agriculture lists the Craig Road land as a growing yard for the Davis Nursery, owned by appellant's mother.
[18] Photographs in the record depict a veritable "forest" of boxed of potted trees located over the entirety of the subject property.
[19] Zaloras testified that most of the delay was caused by a problem with getting a judge assigned to the case, but he did feel that there was some delay by appellant at the outset by "asking for 12 months, not removing them, even though [Zaloras had] requested it be done."
[20] Segal contributed $250 the next day.
[21] The Honorable A. William Maupin, Justice, did not participate in the decision of this matter.
[22] This provision was used only with respect to Count 10 (zoning violation and trespassing).
[1] The secret deal made by Judge D is only one example of the kinds of secret proceedings being conducted by the Commission in 1993 and 1994.
[2] See Gonzalez v. Com'n on Judicial Performance, 33 Cal.3d 359, 188 Cal.Rptr. 880, 657 P.2d 372 (1983) (in banc). This case involved the removal of California Judge Mario Gonzalez. Among other offenses committed by the judge, the California Supreme Court noted that "Judge Gonzalez contacted the deputy in charge of the district attorney's office in East Los Angeles and attempted to induce him to dismiss criminal charges." Id., 188 Cal.Rptr. at 884, 657 P.2d at 376. The California Supreme Court held that "as a matter of law" Judge Gonzalez violated Canon 2B of the Code of Judicial Conduct, which provides that a judge "should not lend the prestige of his office to advance the private interests of others." Id., 188 Cal.Rptr. at 885, 657 P.2d at 377 (emphasis added). The sworn complaint was dismissed by the Commission without a hearing.
[3] The majority refers to my recounting of past Commission abuses as being merely a "regurgitation" of my prior criticisms of the Commission. It is probably true that I am "regurgitating" and restating complaints about the Commission which I have previously voiced; but I do this only in the hope that someone will come to the realization that the history of the Commission has been a history of abuses such as the one now before us. I hope that sometime someone will recognize that this is truly the case. This is the reason for my "regurgitations."
[4] I must express a word of caution about my use of the word "decided." Obviously, a supreme court case cannot be said to have been truly "decided" until the court's judgment is filed and recorded. Consequently, when I say in the present context that the case was "decided" in favor of Judge Davis, naturally I mean only that a majority of the court voted in his favor. It is also true that after such a vote is taken, from time to time justices change their vote and thereby change the result in the case; accordingly, when I say that the case was "decided" in favor of Judge Davis, I am only saying that at one time he had a majority of the court on his side and that now he has a majority of the court against him.
[5] This is not the first time that an appellate jurist has been called upon by moral compulsion and sound legal principle to disclose legitimately the inner workings of an appellate court. I make reference to a book entitled Judging Judges, by Prebble Stoltz (The Free Press; Macmillan Publishing Co., New York, 1991). The subject of Judging Judges was a judicial discipline proceeding involving certain members of the California Supreme Court. The gist of these proceedings was that justices had delayed the judicial process for purposes extraneous to the decision-making process, namely, delaying the issuance of an opinion for political purposes. In the course of the mentioned proceedings, members of the California Supreme Court believed that they were justified in disclosing the existence of certain internal court documents, as I do here.

As stated in the text, I do not raise issues of judicial ethics relative to the manner in which the disposition in this case was changed from a ruling favoring Judge Davis to a ruling that results in his removal from office. My point, as I have stated, is that it is not fair to Judge Davis that such a radical alteration in the court's decision, resulting in such extreme consequences to Judge Davis, should be allowed to follow from the court's delay and from a change in the court's membership.
[6] There are, of course, two ways of looking at this case. The majority, understandably, takes the position that the court, from time to time, makes tentative decisions which are later, on reconsideration, altered or even reversed. The majority is entitled to maintain that the present case is merely one of those cases in which the majority vote shifted (after Justice Steffen's vote in favor of Judge Davis was lost) from one side to the other. On the other hand, Judge Davis might want to argue that this is a highly politicized case in which two biased justices, Justice Young (a former member of the Commission) and Chief Justice Shearing, who has been a steadfast supporter of the Commission's side of things, particularly in the Whitehead case, decided to hold the case up until after Justice Steffen's retirement, in the hope that they might be able to convince Justice Rose or Justice Steffen's replacement to alter the previous decision.